Jerry HURDE, Sr. Plaintiff,

v.

**JOBS PLUS–MED, Jobs Plus, Inc. and A–Plus Galvanizing, Inc., Defendant.**

**No. CIV.A.02–2603–KHV.**

United States District Court, D. Kansas.

Jan. 14, 2004.

Patrik W. Neustrom, Achterberg & Neustrom, Salina, KS, Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, Samantha Parks Angell, Achterberg & Neustrom, Salina, KS, for Plaintiff.

Norman R. Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Jerry Hurde, Sr. filed suit against his former employer, A–Plus Galvanizing, Inc., for racial harassment, discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1866, *as amended,* 42 U.S.C. § 1981.[1] This matter comes before the Court on *Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc.# 60) filed October 1, 2003. For reasons stated below, the Court sustains in part defendant's motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The

---

1. Jobs Plus–Med, another defendant, is apparently a related corporation of Jobs Plus, Inc. Jobs Plus–Med did not employ plaintiff, however, and it was not otherwise involved in the events related to this case. On August 7, 2003, pursuant to a stipulation, the Court dismissed Jobs Plus, Inc. and Jobs Plus–Med as defendants. *See Stipulation And Order For Dismissal With Prejudice* (Doc. # 51).

nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

In July of 2001, plaintiff submitted a job application at PKM Steel, a sister company of A–Plus Galvanizing, Inc. ("A–Plus"). PKM Steel did not have an opening for plaintiff, but Brenda Faram, who handled the hiring for PKM Steel and A–Plus and was the Human Resources Manager for A–Plus, referred plaintiff to Jobs Plus, Inc. ("Jobs Plus"), a job placement agency, to apply for placement at A–Plus. A–Plus utilized Jobs Plus to initially hire employees because A–Plus needed a lot of employees and it was quicker to use Jobs Plus than to hire individuals directly.

Approximately three weeks after plaintiff applied at PKM Steel, he went to Jobs Plus and completed employment applications for both Jobs Plus and A–Plus. Shortly thereafter, Jobs Plus hired plaintiff for placement at A–Plus. During August and September of 2001, plaintiff worked in the A–Plus paint shop. Plaintiff was the only African American employee in the paint shop during that time.

Plaintiff worked on the A–Plus premises, and A–Plus employees supervised and trained him. A–Plus determined plaintiff's hours, days of work and rate of pay, and required him to follow A–Plus policies. If plaintiff was absent from work, he had to notify A–Plus. Plaintiff brought no special skills to his position at A–Plus—all skills which he utilized on the job were acquired during his on-the-job training with A–Plus.

Jobs Plus paid plaintiff and he picked up his paycheck at Jobs Plus. A–Plus reimbursed Jobs Plus for plaintiff's wages under a reimbursement agreement. Jobs Plus issued plaintiff a hard hat and safety glasses which he paid for out of his first pay check.

As Human Resources Manager for A–Plus, Faram provides orientation information for A–Plus employees. She only provides a portion of the orientation, however, for temporary employees. Barbara Fallis, at Jobs Plus, directs the other portion of the orientation—which is held on A–Plus premises. In 2001, Jobs Plus employed Fallis as a job placement specialist in Salina, Kansas. In her position, Fallis matched potential employees with job openings.

At orientation, A–Plus informed plaintiff that it did not tolerate harassment based on race, sex, religion or any other factor. A–Plus provided plaintiff a copy of its Equal Opportunity Policy. Plaintiff felt that A–Plus adequately explained his

rights concerning protection against discrimination based on race.

Each applicant at Jobs Plus, including plaintiff, receives an "Admonishment," which instructs them to contact Jobs Plus at least one hour before the start of their shift if they cannot go to work. Each applicant signs a verification that he has received that document. At some point during plaintiff's employment, that policy changed. A–Plus and Jobs Plus instructed employees to call A–Plus if they were going to be absent. Jobs Plus informed all employees, including plaintiff, to let them know if they had problems on the job.

Plaintiff had two supervisors at A–Plus: foreman Carlson Smith and foreman Joe Gulzow.[2]

In early August of 2001, Carlson Smith told plaintiff that he might use the term "nigger rig" when he was fixing something. Other employees also used that term in the workplace. That same day, Carlson Smith asked plaintiff the difference between when a white person says "nigger" and when a black person says "nigger." On another occasion, Carlson Smith asked plaintiff the difference between the words "nigger" and "nigga." Plaintiff told Smith not to use those types of terms around him. Other than these incidents, Carlson Smith never used the word "nigger" in plaintiff's presence.

Jeremiah Copas and another employee referred to Carlson Smith as "Master Carlson." Employees used the words "nigger," "nigger rig," "afro engineering," and "wet back" in the workplace at A–Plus.

On August 27, 2001, in plaintiff's presence, Copas asked a co-worker about a "half-nigger baby" that someone brought to the A–Plus plant. Copas stated that he could not stand mixed marriages because they made him sick. Plaintiff did not tell Copas that this statement offended him, and he did not report the incident to A–Plus management.

Plaintiff heard a co-employee, Curtis Smith, tell Carlson Smith that he had to "nigger rig" something. Curtis Smith made the comment loudly enough so that plaintiff could hear the comment over the other conversations at lunch. Plaintiff did not bring the incident to the attention of anyone in A–Plus management.

Because of the nature of the work activity at A–Plus, sand had to be moved. Plaintiff had to move sand more often and for longer periods than other employees.[3] The first two times plaintiff performed this task, Carlson Smith helped him. He later required plaintiff to perform this task alone. On one occasion, Curtis Smith moved sand for approximately 30 minutes, but plaintiff had to move sand for three or four hours at a time. Plaintiff complained to Carlson Smith that he felt he was the

**2.** Defendant disputes this fact and correctly points out that plaintiff did not cite any testimony which supports the conclusion that a foreman is a supervisor. *See Defendant A–Plus Galvanizing, Inc.'s Reply To Plaintiff's Response To Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc. # 66) filed November 12, 2003 at 8–9. Defendant's objection is purely technical, however, and appears to have no basis in fact. *See Memorandum Brief In Support Of Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc. # 61) filed October 1,

2003, statement of facts ¶¶ 52–53; Faram Depo. at 67–68 (citing testimony from defendant's human resources manager that foreman is only "supervisor").

**3.** Carlson Smith testified that he did not require plaintiff to shovel sand more than other employees. Carlson Smith testified that other employees, including himself and Copas, were required to shovel sand. All other individuals who moved sand were Caucasian.

primary employee who had to move sand.[4]

Plaintiff contends that because of his race, he was required to drain water from the parking lot at A–Plus after it had rained. On at least three occasions, Carlson Smith instructed plaintiff to drain water from the muddy parking lot. Carlson Smith did not ask any other employees to perform this task.

■■■ On one occasion in late August of 2001, when plaintiff was shoveling sand, another employee asked him "Jerry, what's wrong, Master Carlson won't let you work in the big house with the white folks?" Plaintiff's Depo. at 152. Shortly thereafter, Copas asked plaintiff how to spell his name. Plaintiff spelled his last name and then Copas wrote "Jerry Hurde's whipping post" on a pole in a highly visible area of the A–Plus plant.[5] Copas showed the pole to Carlson Smith and said, "Look, Jerry Hurde's whipping pole, Master Carlson." *Id.* at 155. Copas testified that he wrote plaintiff's name on the pole as a joke. After Carlson Smith saw plaintiff's name on the pole, he showed it to other employees including Curtis Smith. Plaintiff understood his name on the post as a reference to tying up slaves and whipping them. Plaintiff did not specifically tell Carlson Smith, Copas or anyone in A–Plus management that he consid-

---

4. Plaintiff cites the affidavit of a co-worker, Chris West, to support this fact. Defendant objects to the West affidavit because (1) it is not based on personal knowledge, (2) the facts set forth in it would not be admissible and (3) it does not affirmatively show that West is competent to testify to the matters stated in it. *See Defendant A–Plus Galvanizing, Inc.'s Reply to Plaintiff's Response to Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc. # 66) at 2. As to the statement that plaintiff had to move more sand than other employees, the Court overrules defendant's objections. As a co-worker, West is competent to testify as to his opinion of the relative work performed by each employee.

As to the other portions of the West affidavit, defendant raises the same objections. The Court sustains defendant's objections as to paragraph 9 of the affidavit, which states that he believed that Carlson Smith knew about (1) the use of the term "nigger," (2) that Copas called everyone on the crew "massa," and (3) the writing on the whipping pole. Plaintiff's objections to the West affidavit are otherwise overruled. Most of the statements in the affidavit reflect statements which West overheard such as when Copas used the term nigger. Plaintiff does not offer such statements for the truth of the matter asserted, but simply to show that various individuals made the statements. Moreover, the fact that West was a co-worker at A–Plus is sufficient to show that he is competent to identify the individuals who made the various statements.

Plaintiff raises identical objections to the affidavit of Curtis Smith. Those objections are likewise without merit.

5. Defendant argues that because it contradicts his earlier deposition testimony, plaintiff's affidavit should be stricken as to the "visibility" of the pole. The Court will disregard affidavits which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue. *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986). "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* To determine if an affidavit is an attempt to create a sham issue of fact, the Court must consider "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.*

Defendant argues that plaintiff testified that Copas pointed out to Carlson Smith the writing on the pole. The fact that Copas immediately drew Carlson Smith's attention to the pole does not directly contradict the fact that the pole was in a highly visible area of the plant. Accordingly, the Court declines to strike plaintiff's affidavit on this subject.

ered this incident unwelcome, offensive or discriminatory.

In late August of 2001, Copas also told plaintiff about a movie where an African American individual was forced to lay on a street and put his mouth over the curb so a Caucasian man could stomp on his neck and knock out his teeth. Copas told plaintiff that it was a great movie and that plaintiff should see it.[6]

At some point, Carlson Smith suggested to Faram that A–Plus hire plaintiff as a permanent employee. Faram left a note for Carlson Smith to have plaintiff speak with her about work as a permanent employee. On approximately September 4, 2001, plaintiff met with Faram. Faram asked plaintiff if he would work full time at A–Plus. Plaintiff said that he would do so if the discrimination and racial jokes ended.[7] Faram told plaintiff that he should think it through and "[m]ake sure that's what [he] wanted to do." Plaintiff's Depo. at 200.

Until plaintiff complained to Faram in early September, he did not specifically complain to an A–Plus supervisor or management employee that he received certain work assignments because of his race.[8] After plaintiff raised his racial complaints, Faram reminded him that under A–Plus policy, complaints of a racial or discriminatory nature should be made immediately to management.

On September 4, 2001, plaintiff called Fallis to inquire about moving to the third shift. Plaintiff told Fallis that the third shift would be better because of babysitting issues, and he did not mention discrimination at A–Plus.

On September 6, 2001, Fallis talked to plaintiff about pulling him from A–Plus. Plaintiff told Fallis that he loved his job, that he needed the money and that if the discrimination ended, he wanted to retire there. Fallis told Faram that she had met with plaintiff about moving him to another position, but plaintiff had declined and wanted to stay at A–Plus.[9] Faram told Fallis that plaintiff was an excellent worker and that A–Plus did not want to lose him.

Shortly after plaintiff complained about discrimination to Faram, she arranged a meeting between plaintiff, Fallis, Brian Morgan and herself. At the meeting, plaintiff explained that Carlson Smith had made a comment about how he might slip and use word nigger when telling someone

---

6. Defendant argues that plaintiff's affidavit should be stricken on this subject because it contradicts his earlier deposition testimony. In particular, defendant argues that counsel asked plaintiff for a specific chronology of all incidents which plaintiff felt were offensive and plaintiff did not testify about the comments which Copas made about the movie. Defendant cites 67 pages of plaintiff's deposition, which covers several racial incidents while plaintiff was at A–Plus. According to the pretrial order, plaintiff alleges that three separate incidents occurred on August 30, 2001 including the Copas comment about the movie. In these circumstances, plaintiff understandably may have omitted the movie comment by mistake, after being questioned extensively about the other two incidents that same day. Defendant does not cite any testi-

mony which tends to exclude the existence of any other incident of racial harassment. Because plaintiff's affidavit does not "directly" contradict the prior deposition, the Court will not strike it under *Franks v. Nimmo*.

7. About the same time, Fallis called Faram from Jobs Plus and informed her that plaintiff had told her about racial talk.

8. Plaintiff did ask Carlson Smith and Gulzow why he was the only employee who had to perform certain tasks, but he did not allege race discrimination.

9. Later in September, plaintiff told Fallis that he would not accept another position because he wanted to attempt to obtain a janitor position at Salina Regional Health Center.

to "nigger rig" something and that Carlson Smith had also asked him what the difference was when a black person as opposed to a white person used the phrase. Faram testified that plaintiff indicated that he had talked with Carlson Smith and everything was okay and that Carlson Smith was basically trying to find out a black person's point of view in this regard. Plaintiff told everyone at the meeting in early September that other than Carlson Smith's two comments, he did not have any other problems with Carlson Smith on that particular day.[10] Fallis concluded from the meeting that plaintiff had worked out his conflict with Carlson Smith and she thought that plaintiff looked happy when he left the meeting.

After the meeting, Fallis asked plaintiff why he had waited so long to come forward. Plaintiff responded that he was afraid of Carlson Smith, that he did not want to lose his job and that the non-racial jokes were acceptable.

Plaintiff knew that if he felt that he was being discriminated against on the basis of race, he was supposed to immediately report it to management. Plaintiff did not report discrimination to management until his meeting with Faram, Morgan and Fallis in early September.[11]

Faram told plaintiff that she was going to look in to the situation, do an investigation, and meet with all employees to review company policy on discrimination and sexual harassment. She also notified Fallis that this had been accomplished.

After the meeting in early September, Faram and Morgan met individually with West, Copas, LaViolette and Carlson Smith. They did not discuss with Carlson Smith his use of the term "nigger rig."

When Faram interviewed West, he explained that he and plaintiff were joking and laughing and that plaintiff referred to Carlson Smith as "Master Carlson."

When Faram met with Copas, he admitted writing "Jerry's whipping pole" on the pole but he stated that he meant it in the way that Carlson Smith drove his whole crew, and not in a racial way. Faram testified that to her, a whipping pole refers to someone being tied to the pole and whipped. Copas admitted to Faram and Morgan that he made the comment about "half-nigger babies." Faram testified that Copas told her that he had told plaintiff that he was sorry for the comment and that despite his personal beliefs, he should not have made the comment.

When Faram interviewed LaViolette, he said that he and plaintiff were good friends, that plaintiff had a lot of personal things going on and that they did talk a lot when they worked together moving sand. LaViolette said that everything really started as a joke and that plaintiff was joking himself, but things were not a joke when Copas made the comment about interracial babies because that was a very sensitive issue for plaintiff.[12]

A–Plus gave West, Copas, LaViolette and Carlson Smith general verbal reprimands for inappropriate joking. A–Plus

---

10. The record does not reflect whether plaintiff was referring to the day Carlson Smith made the comments or the day of plaintiff's meeting with Faram. For purposes of defendant's motion for summary judgment, the Court assumes that plaintiff was referring to the particular day that Carlson Smith had made the two comments.

11. Plaintiff did object to Carlson Smith regarding his use of the terms "nigger-rig," "nigger" and "nigga."

12. Plaintiff testified that he participated in the non-racial jokes and that they were acceptable, but that he found the racial ones offensive.

did not specifically reprimand Carlson Smith for his use of the term "nigger rig."

In early September, Carlson Smith held a meeting with his crew about the whipping post incident.[13]

After Faram and Morgan had completed their interviews, they again met with plaintiff. They told plaintiff that West had admitted making a comment to him about playing in the sand and that plaintiff had jokingly laughed and referred to Carlson Smith as Master Carlson. Morgan and Faram also told plaintiff that Copas had said that he had not meant anything racial by the comments about the whipping post and that the comment was directed at how Carlson Smith drives his entire crew. Morgan and Faram also told plaintiff that they learned in the investigation that plaintiff had participated in the joking with respect to the whipping post and that, in fact, plaintiff had told Copas how to spell his name. Faram informed plaintiff that she told the various individuals that A-Plus would not tolerate discrimination of any nature and that even if discriminatory comments were meant as a joke, A-Plus would not tolerate such conduct.

Plaintiff told Morgan and Faram that he did not mind the non-racial jokes, and that he wished things could be the way they were before the discriminatory conduct and racial jokes began.

On September 10, 2001 during the early morning, plaintiff found a note on his truck in the A-Plus parking lot.[14] The note stated roughly: "why you fucking with us white boys, nigger, if you rat on someone out here one more time, nigger, we're going to fuck you up." *See* Plaintiff's Depo. at 159–60; Plaintiff's Depo. Exhibit 6 at 03–020, attached as Exhibit 16 to *Plaintiff's Exhibit Index* (Doc. # 65). Plaintiff showed the note to his foreman, Gulzow, but he did not ask Gulzow to show the note to A-Plus management. Plaintiff does not know who put the note on his truck.[15]

On September 10, 2001 at approximately 7:00 a.m., Gulzow informed Faram that plaintiff had left upset at about 4:00 a.m. after finding a note on his truck. Faram called plaintiff and left a message on his home recorder a couple of times that same morning, telling plaintiff that she would like him to come to her office to talk about the note and to bring the note so she could address the issue. Plaintiff did not call Faram back or discuss those messages with her. Faram also called Fallis and told her that a note had been left on plaintiff's truck and that she would like to meet with Fallis and plaintiff to address the issue.

Later during the afternoon of September 10, plaintiff gave the note to Fallis who faxed Faram a copy. Except for showing Gulzow the note, plaintiff did not provide the note to A-Plus. Faram later learned that plaintiff did not want to meet to dis-

---

**13.** A foreman ordinarily is not allowed to hold a meeting about such a complaint without a member of management present. A-Plus classifies a foreman as a "supervisor," but not a "manager."

**14.** Defendant argues that the Court should not consider this note because plaintiff cannot show that A-Plus employees placed it on his truck. For purposes of summary judgment, however, the Court finds that plaintiff has presented sufficient circumstantial evidence that a co-employee left the note. Plaintiff's

truck was in the parking lot of A-Plus in the very early morning hours, A-Plus is a private facility which is not open to the public, and A-Plus has strict rules and policies which prohibit unauthorized individuals from coming onto the premises. Also, the note appears to be a direct response to the complaints of discrimination which plaintiff reported to Faram some six days earlier.

**15.** Plaintiff did not take the note to police until September 18, 2001.

cuss the note. Faram also contacted the Salina Police Department to report the note as a racial threat to one of its employees. The responding police officer told Faram that for anything further to be done, plaintiff would have to make a police report.

Plaintiff told Fallis that because of the note, he wanted to change his hours so that he would leave the third shift at 6:00 a.m. instead of 7:30 a.m. Fallis said that the change was acceptable. Plaintiff did not contact Faram to ask if this schedule change was acceptable to A–Plus, because to his knowledge Jobs Plus was the one that he "called in sick to and reported to." [16] Plaintiff's Depo. at 204–05. Plaintiff wanted to continue at A–Plus, but he thought that if he left his shift early for a while, he could avoid contact with those on the first shift and the problems would stop.

Later on September 11, 2001, on his truck at his home, plaintiff found a picture of African Americans with a noose around their necks. Plaintiff does not know who put the picture on his truck. The picture did not directly refer to plaintiff or to A–Plus.

At approximately 5:30 a.m. on September 12, 2001, Faram met with third-shift employees to review A–Plus policies regarding discrimination. During this meeting, Faram informed employees that A–Plus would not tolerate any conduct that violated these policies and that if A–Plus found that someone had violated the policies, it would terminate that individual.

In early September of 2001, Faram again offered plaintiff a full-time position at A–Plus and told him to contact her the following week. On September 12, 2001, plaintiff asked Faram if he would be able to go full time at A–Plus. Faram told him "[n]ot at this time." Plaintiff's Depo. at 288.

On September 16, 17 and 18, 2001, plaintiff called Fallis at Jobs Plus and told her that he was sick and would not be able to work those days.

At approximately 1:30 a.m. on September 18, 2001, plaintiff took his cell phone to A–Plus and asked Gulzow to listen to a message on it. See Plaintiff's Depo. at 169–70. The voice mail message stated something to the effect of "Why you still here?" [17] Plaintiff reported this message to Gulzow, who listened to the message but could not understand what was being said. Gulzow advised plaintiff to give the recording to the police and to him (so that he could let personnel listen to it), but plaintiff did not do so.

On September 19, 2001, plaintiff did not report to work at A–Plus or contact A–Plus or Jobs Plus to say why he was not at work.

On September 20, 2001, Faram called Fallis and told her that plaintiff had not reported for work the previous day. Fallis told Faram that she did not know of plaintiff's absence. A–Plus policy provides that

---

**16.** Plaintiff states that after receiving Gulzow's permission, he moved to the third shift to avoid the first shift co-workers who had discriminated against him. See Plaintiff's Memorandum Brief In Opposition To Defendant's Motion For Summary Judgment (Doc. # 64) at 15. Plaintiff cites only his affidavit which does not mention anything about this issue. See Exhibit Q to Plaintiff's Exhibit Index (Doc. # 65). Accordingly, the Court disregards plaintiff's unsupported statement.

**17.** The Court does not consider the actual transcript of the message because the record contains no supporting affidavit, deposition testimony, or other relevant evidence authenticating the document. Schartz v. Unified Sch. Dist. No. 512, 963 F.Supp. 1067, 1070 (D.Kan.1997); D. Kan. Rule 56.1.

ordinarily, if an employee is a no-show and does not call in for three days, the employee is presumed to have voluntarily quit. Faram assumed that plaintiff had voluntarily quit even though he had only failed to call in on one day (September 19). When plaintiff quit showing up for work at A–Plus, Jobs Plus considered such action misconduct.

On September 20, 2001, Fallis notified Faram that Jobs Plus was removing plaintiff from A–Plus and terminating his position. A–Plus did not ask Jobs Plus to pull plaintiff, and Fallis decided to pull him for his own protection. At times Fallis felt that A–Plus had handled the problem appropriately but at other times she felt that A–Plus had not done anything about the problem. *See* Fallis Depo. at 129. When Fallis called plaintiff on September 20, plaintiff told her, "I can't talk to you. My attorney says I can no longer speak to you about anything."

On September 20, 2001, Faram called Fallis about the message which plaintiff had received. Fallis told Faram that she had met with the employees of Jobs Plus who were working at A–Plus and asked them about the working environment. All of them had told her that they had no problems, that they like working at A–Plus, and that they were looking forward to being off temporary status.

On December 4, 2002, plaintiff filed suit against Jobs Plus–Med, Jobs Plus and A–Plus for violations of Title VII, 42 U.S.C. § 2000e *et seq.*, and Section 1981, 42 U.S.C. § 1981. As to A–Plus, plaintiff alleges that A–Plus (1) because of his race, gave him undesirable work (shoveling sand more often and for longer periods than other employees and draining water from the muddy parking lot) and withdrew its offer of full-time employment, (2) maintained a hostile or abusive work environment based on race, (3) retaliated for his complaints of race discrimination by withdrawing its employment offer to him. A–Plus seeks summary judgment on all of plaintiff's claims.

### *Analysis*

### I.  A–Plus As Plaintiff's Employer

A–Plus first argues that it is entitled to summary judgment because it was not plaintiff's employer. In the Title VII context, the Tenth Circuit has approved the hybrid test approach to determine who qualifies as an employer. *See Lambertsen v. Utah Dep't of Corr.,* 79 F.3d 1024, 1028 (10th Cir.1996). In *Lambertsen,* the Tenth Circuit noted:

> In determining whether a plaintiff has demonstrated an employee-employer relationship for purposes of federal anti-discrimination legislation, courts have generally applied either the economic realities test or the hybrid test. *Oestman,* 958 F.2d at 305 (discussing both tests). Under the hybrid test, the main focus of the court's inquiry is the employer's right to control the "means and manner" of the worker's performance. *Id.* However, the hybrid test also looks at other factors, including: (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer

pays social security taxes; and (11) the intention of the parties. *Id.* No single factor is conclusive. Rather, the courts are to look at the totality of circumstances surrounding the working relationship between the parties. *Id.*

*Lambertsen,* 79 F.3d at 1028 (footnote omitted).

Both parties cite *Lambertsen* as the test to determine whether A–Plus was plaintiff's employer. While *Lambertsen* provides an appropriate framework to decide whether an individual is an employee or an independent contractor and which of two entities is plaintiff's employer, the test provides an awkward framework where two separate entities *co*-determine the essential terms and conditions of employment. *See Bristol v. Bd. of County Comm'rs of County of Clear Creek,* 312 F.3d 1213, 1217 (2002). In the latter instance, the joint employer test should be used.[18] *See id.*

■ The joint-employer test addresses whether two independent entities "share or co-determine those matters governing the essential terms and conditions of employment" such that both entities can be considered employers of the same individuals. *Id.* at 1218–19 (quoting *Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1360 (11th Cir.1994)). The Tenth Circuit recently explained:

> Title VII case law recognizes that two separate entities may be a worker's employer if they share or codetermine matters governing the essential terms and conditions of the worker's employment. When a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of the worker. An independent entity with sufficient control

over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII.

*Sizova v. Nat'l Institute of Stds. & Tech.,* 282 F.3d 1320, 1330 (10th Cir.2002) (quoting *Zinn v. McKune,* 143 F.3d 1353, 1361 (10th Cir.1998) (Briscoe, J., concurring)).

■ Plaintiff has provided ample evidence for a reasonable jury to find that A–Plus and Jobs Plus were joint employers for purposes of Title VII. Plaintiff worked on the premises of A–Plus, whose employees supervised and trained him. A–Plus determined plaintiff's hours, days of work and rate of pay, and required plaintiff to follow its policies. If plaintiff was absent from work, he had to notify A–Plus. Plaintiff brought no special skills to his position at A–Plus—all skills which he utilized on the job were acquired during on-the-job training with A–Plus. Important aspects of plaintiff's work were subject to control by A–Plus. A–Plus has shown that it formally employed and paid plaintiff, but it has not shown that it did not control important aspects of the terms and conditions of plaintiff's work. Accordingly, the Court overrules defendant's motion for summary judgment on this issue.

## II. Disparate Treatment

■ Plaintiff claims that defendant discriminated against him on the basis of race. Defendant contends that it is entitled to summary judgment because plaintiff cannot establish a prima facie case of disparate treatment. Plaintiff alleges that because of his race, defendant (1) required him to shovel sand more often and for longer periods than other employees, (2) required him, the only black employee, to dig ruts in a muddy parking lot to allow

---

**18.** The "single employer" test is not applicable here because Jobs Plus and A–Plus are separate entities. *See Bristol,* 312 F.3d at 1217–19.

water to drain and (3) withdrew its employment offer of full-time employment. As to each claim, plaintiff may demonstrate a prima facie case by showing that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.[19] *See Hysten v. Burlington N. & Santa Fe R.R. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

A–Plus argues that because it was not plaintiff's employer, plaintiff did not suffer any adverse employment action. As explained above, plaintiff has presented sufficient evidence for a reasonable jury to find that A–Plus was his employer. For purposes of plaintiff's disparate treatment claim, A–Plus does not dispute that "adverse employment action" includes (1) requiring plaintiff to shovel sand more often and for longer periods than other employees; (2) requiring plaintiff to drain water from the muddy parking lot, when other employees were not required to do so; and (3) withdrawing its offer of employment to plaintiff. The Court therefore assumes that plaintiff has met the first two elements of his prima facie case.

■ A–Plus argues that plaintiff cannot satisfy the third element because he has not presented "direct evidence" of racial discrimination. *Memorandum Brief In Support Of Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc. # 61) at 25. Of course, plaintiff need not offer direct evidence of

discrimination to satisfy his prima facie burden. *See Hysten*, 296 F.3d at 1181–82 (circumstances giving rise to inference of discrimination are sufficient).

■ As to the work requirements of shoveling sand and digging ruts in the parking lot, the essence of plaintiff's claim is that defendant treated him less favorably than similarly situated employees. A comparison to similarly situated employees is therefore appropriate in analyzing whether plaintiff has met the third element of a prima facie case. *See id.* (ordinarily third part of prima facie test will be satisfied by proof that employer treated similarly situated employees more favorably). Viewing the evidence in the light most favorable to plaintiff, he had to move sand more often and for longer periods than other employees and he was the only employee who had to drain the parking lot. Accordingly, the Court overrules defendant's motion for summary judgment as to these claims.

■ As to plaintiff's claim that A–Plus withdrew its employment offer to plaintiff because of his race, plaintiff has not presented facts which give rise to an inference of discrimination. A–Plus offered plaintiff a full-time job even though it knew his race. A–Plus did not withdraw the employment offer until plaintiff had complained of discrimination. Although such evidence is sufficient to establish a prima facie case of retaliation, *see infra* text part IV, it is insufficient by itself to create an inference that A–Plus withdrew its em-

**19.** Plaintiff cites *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998), for the proposition that to establish a prima facie case, he must show that defendant treated him differently than similarly situated employees outside the protected class. Proof that similarly situated individuals are treated in a preferential manner is one way to meet the third element of a prima facie case but it is not necessarily the only way. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (prima facie standard is not inflexible; Supreme Court specification of prima facie proof required is not necessarily applicable in every factual situation); *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir.2000).

ployment offer because of plaintiff's race. Therefore the Court sustains defendant's motion on plaintiff's disparate treatment claim based on the fact that A–Plus withdrew its employment offer.

## III. Hostile Work Environment Racial Harassment

■ Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff may establish a violation of Title VII by proving that discrimination based on race created a "hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that (1) he is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *See Brandau v. State of Kansas,* 968 F.Supp. 1416, 1420 (D.Kan. 1997).

■ To prevail under a hostile work environment theory, plaintiff must show that racially-oriented conduct had the purpose or effect of unreasonably interfering with his work performance or created an intimidating, hostile or offensive working environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the work place, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.; see Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. *See Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

Defendant asserts that it is entitled to summary judgment because (1) plaintiff has not shown that the harassment was sufficiently severe or pervasive to create an abusive working environment and (2) as a matter of law, defendant has satisfied the elements of its affirmative defense under *Faragher.*

### A. Hostile Or Abusive Environment

■ Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]laintiff's employment." *See Smith v. Northwest Fin. Acceptance, Inc.,* 129 F.3d 1408, 1413 (10th Cir.1997). "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir.1999). "[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Northwest Fin.,* 129 F.3d at 1414.

Plaintiff's evidence of a hostile work environment is that

1. Carlson Smith told plaintiff that he might use the term "nigger rig" when he was fixing something. Other employees also used that term in the workplace. That same day, Carlson Smith asked plaintiff the difference between when a white person says "nigger" and when a black person says "nigger."

2. Carlson Smith asked plaintiff the difference between "nigger" and "nigga."

3. Copas and another employee referred to Carlson Smith as "Master Carlson." Employees used the words "nigger," "nigger rig," "afro engineering," and "wet back" in the workplace.

4. Carlson Smith required plaintiff to shovel sand more often and for longer periods than other employees.

5. Carlson Smith required plaintiff to dig ruts in a muddy parking lot to allow water to drain on three occasions while he did not ask any other employees to perform this task.

6. In plaintiff's presence, Copas asked a co-worker about a "half-nigger baby" that someone brought to the plant. Copas stated that he could not stand mixed marriages because they made him sick.

7. Another employee asked plaintiff "Jerry, what's wrong, Master Carlson won't let you work in the big house with the white folks?" Shortly thereafter, Copas wrote "Jerry Hurde's whipping post" on a pole on the premises of A–Plus in a highly visible area of the plant. Copas showed the pole to Carlson Smith and said "Look, Jerry Hurde's whipping pole, Master Carlson." After Carlson Smith, a supervisor, saw plaintiff's name on the pole, he showed it to other employees including Curtis Smith. Plaintiff understood his name on the post as a reference to tying up slaves and whipping them.

8. Copas told plaintiff about a movie where an African American individual was forced to lay on a street and put his mouth over the curb so a Caucasian man could stomp on his neck and knock out his teeth. Copas told plaintiff that it was a great movie and plaintiff should see it.

9. Shortly after plaintiff complained of discrimination, he found a note on his truck in the A–Plus parking lot. The note stated roughly: "why you fucking with us white boys nigger, if you rat on someone out here one more time, nigger, we're going to fuck you up."

■■ In this case, plaintiff has produced evidence that the workplace was permeated with racially offensive comments. In addition, plaintiff's supervisor, Carlson Smith, used racially derogatory language, allowed his subordinates to call him "Master Carlson" and showed other employees plaintiff's "whipping post." Taken as a whole, the Court finds that the facts set forth above are sufficiently pervasive to create an objectively hostile work environment.[20] Accordingly, the Court

---

**20.** Defendant also contends that plaintiff cannot satisfy the subjective component of the test, *i.e.* whether plaintiff himself considered the conduct offensive and unwelcome. For purposes of summary judgment, however, plaintiff has easily satisfied the subjective test. Plaintiff told Carlson Smith, his supervisor, on at least two occasions that he did not approve of the term "nigger" or any connotation of that term. Moreover, though plaintiff concedes that he engaged in some joking in the workplace, he denies that he ever participated in any joking of a racial nature and specifically took offense to such conduct.

overrules defendant's motion on this ground.

### B. *Faragher Affirmative Defense*

Defendant argues that it is entitled to summary judgment because it has met the elements of an affirmative defense to vicarious liability as articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In *Faragher*, the Supreme Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275.

■ To prevail on its defense, defendant must show that "(1) the harassment did not rise to the level of a tangible employment action; (2) it took reasonable care, as evidenced by its antiharassment policy, to prevent and correct promptly any sexually harassing behavior; and (3)[p]laintiff unreasonably failed to utilize the antiharassment policy." *Mallinson–Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir.2000).

■ The existence of tangible employment action is critical, because *Faragher* attempts to shield employers from liability which arises from actions that can only be constructively attributed to them. *Desmarteau v. City of Wichita, Kan.*, 64 F.Supp.2d 1067, 1079 (D.Kan.1999). *Faragher* recognizes that tangible employment actions bring to bear the official power of the employing enterprise and require official acts of the employer. Therefore, if the alleged harasser "directly fired, demoted or reassigned the victim of harassment and that conduct formed part of the factual basis for the sexual harassment claim," the employer is fairly held liable and the *Faragher* defense is not available. *Dunegan v. City of Council Grove, Kan. Water Dep't*, 77 F.Supp.2d 1192, 1200 (D.Kan. 1999).

■ Defendant argues that it is entitled to summary judgment because it had a reasonable policy on race discrimination and plaintiff did not take advantage of the policy. In its initial memorandum,

defendant does not specify which alleged employment actions are protected under *Faragher*. As to the requirement that plaintiff move sand more often than other employees and drain the parking lot by himself, *Faragher* does not apply at this stage because defendant has not shown that these adverse job assignments are not tangible employment actions. As to the racial comments and other incidents, the *Faragher* defense applies only to the actions of supervisors. *See Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1024 (10th Cir.2001). The most serious incidents of racial harassment appear to have been by co-employees. Although plaintiff's supervisor, Carlson Smith, made some racial comments and showed other employees plaintiff's "whipping post," no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action. *See Faragher*, 524 U.S. at 806–08, 118 S.Ct. 2275. In its reply, defendant does not dispute that a withdrawal of an employment offer, if true, would constitute a tangible employment action. Accordingly, at this stage, defendant has not established the elements of its affirmative defense under *Faragher* as a matter of law.

## IV. Retaliation

■ Plaintiff alleges that after he raised the issue of discrimination to Faram, A–Plus retaliated by withdrawing its offer of employment.[21] In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) he engaged in protected opposition to Title VII discrimination; (2) he suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a casual connection links the protected activity and the adverse employment action. *See Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir.1998), *cert. denied*, 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999); *Thomas*, 111 F.3d at 1513. Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.1982).

■ Defendant apparently contends that it is entitled to summary judgment because plaintiff did not suffer any adverse employment action. In particular, defendant maintains that it never withdrew the employment offer until plaintiff failed to show up for work on September 16, 17 and 18, 2001. Viewing the evidence in the light most favorable to plaintiff, defendant withdrew the employment offer on September 12 when Faram told plaintiff that A–Plus would not hire him as a full time permanent employee. Only eight days earlier, plaintiff had told Faram his concerns about discrimination. Given the close temporal proximity between plaintiff's protected conduct and the adverse action, plaintiff has satisfied his burden to establish a prima facie case. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (one and one-half month period between protected activity and adverse action may, by itself, establish causation); *Burrus*, 683 F.2d at 343. Accordingly, the Court overrules defendant's motion for summary judgment on this ground.

---

**21.** Defendant also argues that plaintiff cannot establish a claim of retaliatory harassment. Plaintiff maintains that he does not assert such a retaliation claim. *See Plaintiff's Memorandum Brief In Opposition To Defendant's*

*Motion For Summary Judgment* (Doc. # 64) filed October 21, 2003 at 42. The Court therefore need not address defendant's arguments on this issue.

1215

## V. Section 1981 Claim

The same analytical framework, first articulated in a Title VII case, applies as well to claims under Section 1981.[22] *See Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.), *cert. denied*, 513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994). Defendant contends that plaintiff's Section 1981 claim fails as a matter of law because A–Plus never withdrew its employment offer to him. As explained above, plaintiff has presented sufficient evidence for a reasonable jury to find that A–Plus withdrew its employment offer on September 12, 2001. Accordingly, defendant's motion for summary judgment on this issue is overruled.

**IT IS THEREFORE ORDERED** that *Defendant A–Plus Galvanizing, Inc.'s Motion For Summary Judgment* (Doc. # 60) filed October 1, 2003 be and hereby is **SUSTAINED in part.** The Court sustains defendant's motion on the portion of plaintiff's disparate treatment claim based on the fact that A–Plus withdrew its employment offer to plaintiff. Defendant's motion is otherwise overruled.

---

**22.** Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contract" includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.