**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 15, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

LISA M. KNITTER,

       Plaintiff - Appellant,

v.

CORVIAS MILITARY LIVING, LLC,
f/k/a Picerne Military Housing, LLC,

       Defendant - Appellee.

No. 13-3027

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 6:11-CV-01365-JWL)**

Randall K. Rathbun (Molly M. Gordon, with him on the briefs), Depew Gillen Rathbun & McInteer, LC, Wichita, Kansas, appearing for Appellant.

Manesh K. Rath, Keller and Heckman LLP, Washington, D.C. (Jacquelyn L. Thompson, Keller and Heckman LLP, Washington, D.C., and Stephanie N. Scheck, Stinson Leonard Street LLP, Wichita, Kansas, with him on the brief), appearing for Appellee.

Before **GORSUCH, MATHESON,** and **BACHARACH,** Circuit Judges.

**MATHESON**, Circuit Judge.

Lisa Knitter worked as a "handyman"[1] for Lewis General Contracting, Inc. ("LGC") from March 2010 to October 2010. During this time, LGC's sole client was Picerne Military Housing, LLC ("Picerne"), now known as Corvias Military Living, LLC.[2] Ms. Knitter performed handyman services exclusively on Picerne properties.

Ms. Knitter sued Picerne under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Ms. Knitter alleged (1) she was paid lower wages than her male counterparts and (2) Picerne effectively fired her in retaliation for her complaints of sexual harassment and wage discrimination. She also alleged that (3) after she was fired, Picerne denied her application for vendor status in retaliation for her prior complaints of discrimination.

The district court granted summary judgment to Picerne, dismissing Ms. Knitter's Title VII action because Picerne was not her employer. The district court also dismissed her claim for retaliatory denial of vendor status because Ms. Knitter did not apply for employment with Picerne when she applied to be a vendor.

Ms. Knitter now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] Following the practice of the parties and the district court, we use the term "handyman" in a "non-gender-specific fashion." Aplt. Appx., Vol. II at 618 n.1; *see also* Aplt. Br. at 7; Aplee. Br. at 2-3.

[2] Following the practice of the parties, we will continue to use the name "Picerne" to describe Corvias Military Living, LLC. *See, e.g.*, Aplee. Br. at 1. Picerne's name change has no effect on this case.

# I. BACKGROUND

## A. *Factual Background*

We recite these facts in the light most favorable to Ms. Knitter as the party

opposing summary judgment. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1211 n.1 (10th Cir.

2013).[3]

---

[3] We have considered all portions of the appellate record, including an affidavit from Ms. Knitter and one from her husband, Kevin Knitter, submitted in response to Picerne's motion for summary judgment after the close of discovery. *See* Aplt. Appx., Vol. II at 522-25, 562-74.

On appeal, Picerne argues we should disregard these documents because they are "sham" affidavits submitted to create the appearance of a genuine dispute of material fact by controverting Ms. Knitter's earlier statements. *See* Aplee. Br. at 36-37. We disagree.

Sham affidavits, though "unusual," arise when a witness submits an affidavit that contradicts the witness's prior testimony. *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). Although "[a]n affidavit may not be disregarded solely because it conflicts with the affiant's prior sworn statements," we may nonetheless disregard a conflicting affidavit if it "constitutes an attempt to create a sham fact issue." *Id.* (quotations omitted). "In determining whether an affidavit creates a sham fact issue, we consider whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" *Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

Neither affidavit here fits the "sham affidavit" paradigm. Ms. Knitter's affidavit is brief and does not appear to contain any allegations that would directly contradict her earlier deposition testimony regarding the question presented in this appeal—whether Picerne was her employer for purposes of Title VII. *See* Aplt. Appx., Vol. II at 524. Nor does Picerne argue this is the case; to the contrary, it contends her affidavit "attempts to obfuscate, not clarify, facts she already put on the record during her deposition," Aplee. Br. at 37, which, even if true, does not necessarily create a sham dispute.

Mr. Knitter, meanwhile, was not deposed during discovery; therefore, there is no prior testimony for his affidavit to contradict.

To the extent Picerne suggests we should disregard these affidavits because they were submitted after the close of discovery, we also disagree. Picerne did not object to

Continued . . .

1. **Picerne's and LGC's Relationship**

    a. *Picerne's management of Fort Riley housing*

Picerne is a national property management company that provides and manages housing on several military bases around the country, including the United States Army base at Fort Riley, Kansas. Picerne contracts with outside vendors for many services, including handyman repairs.

Picerne's properties at Fort Riley are divided into six "neighborhoods" of residences. Picerne employs one "neighborhood manager" and one "maintenance supervisor" for each neighborhood. Appx., Vol. I at 181, 232-33; Appx., Vol. II at 419. Picerne also employs and trains maintenance technicians who perform handyman services in occupied housing and report to the neighborhood maintenance supervisor. Unlike subcontractor handymen, who are not required to have any specialized training, Picerne maintenance technicians tend to have specialized skills and certifications in areas such as heating, ventilation, and air conditioning; electrical; and plumbing.

---

Cont.

the introduction of either affidavit before the district court based on tardiness, instead arguing, as it does now, that the affidavits "attempt[] to create disputes that do not genuinely exist" and lack a credible factual basis. Aplt. Appx., Vol. II at 607-08. The district court did not exclude the affidavits and indeed appeared to consider them in its grant of summary judgment. *See id.* at 622-23 (referring to testimony of "the Knitters," which must include Mr. Knitter's affidavit because he was never deposed). We decline to exclude these affidavits now.

When a family moves out of a Picerne-managed residence, Picerne employees and contractors work together to "turn" the home. A turn prepares a recently vacated housing unit for new occupants. During a turn, the neighborhood maintenance supervisor walks through the home and determines what work needs to be done before new residents can move in. The typical turn involves basic handyman repairs, specialized cleaning, painting, and utility services. A variety of vendors provide these services. We focus here on handymen, who are primarily responsible for executing the basic repairs involved in a turn.

After his initial walk-through, the neighborhood maintenance supervisor prepares a "walk sheet" listing the necessary repairs. Once the walk sheet listing work orders is ready, the maintenance supervisor either contacts the vendor company to request a handyman to assist with the turn, or contacts a handyman directly if a relationship has been established.

b. *LGC's contract work for Picerne*

LGC is a handyman company owned and operated by its founder, Frank Lewis. LGC contracts to provide handyman services to outside clients, with approximately 98 to 100 percent of revenues coming from Picerne. Appx., Vol. II at 462-64. During the time Ms. Knitter worked for LGC, all or almost all of LGC's business came from Picerne.[4]

---

[4] It is unclear from the record whether and when Picerne was LGC's only client. Mr. Lewis testified that since LGC went into business in 2006, it has had clients other than Picerne, particularly during "the early years," Aplt. Appx. Vol. II at 465, but that 98

Continued . . .

Picerne pays a flat fee to handymen vendors, including LGC, for every turn performed. These fees generally vary depending on the neighborhood, but not depending on the particular vendor or handyman who performs the turn. The fees appear on a published pay scale provided to all vendor companies, including LGC, listing the specific handyman tasks included in a standard turn. If handymen must perform additional tasks not listed on the pay schedule, Picerne pays an additional charge for those particular repairs.

Once Picerne pays LGC its fee for a given turn, LGC retains 15 percent as its own administrative fee, then pays its handymen after withholding FICA taxes and federal and Kansas income taxes. Picerne does not pay vendor handymen directly. LGC provides its handymen with W-2 forms.

---

Cont.

to 100 percent of LGC's revenues came from Picerne because working for Picerne "[i]s pretty much what [LGC] do[es]," *id.* at 462. Mr. Lewis also stated that LGC could lose 100 percent of its business if Picerne is unsatisfied with LGC's work, *id.* at 463-64, and that when Ms. Knitter worked for LGC, no work was available for her to do outside of Picerne contracts, *id*. at 464. Meanwhile, Ms. Knitter testified that when Mr. Lewis notified her she could no longer work for Picerne through LGC, she asked if he had other work available for her, and in response he told her "[h]e was full." Aplt. Appx., Vol. I at 135.

Because Ms. Knitter was the non-moving party and we are required to "draw all reasonable inferences" in her favor, *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 538 (10th Cir. 2014), we credit her inference that Mr. Lewis "admitted that 100% of his work was coming from Picerne" at or around the time of Ms. Knitter's termination, Aplt. Appx., Vol. II at 407; *see also* Aplt. Br. at 6.

In contrast to Picerne's own maintenance technicians, for whom Picerne provides training, Picerne's relationship with the vendor-provided handymen is less formal. Picerne does provide a mandatory hazard awareness program for all Picerne subcontractors, which includes safety equipment training. Vendor handymen also receive their assignments from Picerne neighborhood supervisors, and Picerne maintenance supervisors provide handymen instructions for each turn.

2. **Ms. Knitter's Work as an LGC Handyman**

a. *Initial employment and training*

In March 2010, Ms. Knitter approached Mr. Lewis for a job at LGC. Mr. Lewis knew Ms. Knitter's husband, Kevin Knitter, and hired Ms. Knitter provided Mr. Knitter would volunteer to assist her on the job when needed. LGC never formally employed Mr. Knitter, who is disabled and unable to work full time.

Ms. Knitter was already skilled in some basic handyman tasks. Her husband gave her additional training. Ms. Knitter attended Picerne's mandatory safety training for vendor handymen. Neither Mr. Lewis nor Picerne provided Ms. Knitter with any additional formal training, although Picerne employees would occasionally demonstrate to the Knitters "how [Picerne] wanted things done," including how to repair binding doors or other specific tasks. Appx. Vol. II at 566.

b. *Work routines*

Ms. Knitter, often accompanied by her husband, worked from March to October 2010 completing turns on Picerne units in several neighborhoods at Fort Riley.

### i. Assignments and schedule

Ms. Knitter received assignments directly from Picerne's maintenance supervisors. The supervisors created punch lists during their inspections before a turn. They then wrote Ms. Knitter's assignments on walk sheets. Mr. Lewis did not participate in inspections or direct Ms. Knitter and her husband regarding specific assignments.

Ms. Knitter testified that, apart from the ultimate deadline Picerne set to complete a turn, she set her own schedule for completing assignments. Ms. Knitter arrived at Fort Riley at different times each day based on the number of units she had scheduled to turn on a given day.

When Ms. Knitter arrived at Fort Riley to work on a turn, she went to the "neighborhood office" of the neighborhood where she was scheduled to work to receive her assignments. Picerne notified Ms. Knitter "which jobs needed to be done on which days and the priority of those jobs." Appx., Vol. II at 567. Within a given job, Ms. Knitter performed the tasks in any order she chose and set her own times for lunch breaks or other scheduling matters.

If no assignments were available for Ms. Knitter at Fort Riley on a given day, she and her husband did not work for LGC or on Picerne's premises that day. When Ms. Knitter was going to be away from work, she notified a Picerne neighborhood supervisor. She did not tell Mr. Lewis. During the 133 business days Ms. Knitter worked for LGC, she spent 94 days on Picerne properties and did not work the remaining days.

### ii. Equipment and dress code

In accordance with LGC and Picerne policy, Ms. Knitter and her husband brought their own tools to a unit to perform a turn. Picerne provided more specialized equipment, including parts and "exceptionally tall ladders," Appx., Vol. I at 173, as well as "water keys, screen rollers, door knob lock set jigs, closet augers, allen wrenches and specialty tools necessary to rebuild a [M]oen faucet, rolls of paper towels, and garbage bags," Appx., Vol. II at 568.

Picerne required both Ms. and Mr. Knitter to adhere to a dress code that banned shorts and sleeveless shirts. Picerne also required the Knitters to wear safety harnesses and protective eyewear when completing specific tasks.

### iii. Supervision and discipline

Ms. Knitter and her husband generally performed turns unsupervised unless they needed assistance from Picerne maintenance supervisors with specific issues or additional work not listed on the work order. Picerne supervisors occasionally showed the Knitters how they wanted specific tasks performed.

After all vendor crews—including LGC handymen and specialized painting or carpet crews—had completed their work, Picerne supervisors conducted walk-throughs to ensure all work had been properly completed. According to the Knitters, Mr. Lewis never participated in these walk-throughs. Ms. Knitter testified, however, that Mr. Lewis "came on occasion" to inspect LGC painters who were working in the same unit as she was. Appx., Vol. I at 173-74; *see also id.* at 185.

Occasionally, Ms. Knitter's work did not satisfy Picerne maintenance supervisors. When that happened, a supervisor either contacted Mr. Lewis to notify him that Ms. Knitter had not completed her work satisfactorily or contacted Ms. Knitter directly to rectify the errors.

Picerne supervisors testified they never formally disciplined any LGC handymen, including Ms. Knitter. Mr. Knitter, however, stated that if he and Ms. Knitter "were caught without wearing a safety harness, [they] were fined and that money went directly to Picerne," although he did not provide any instances of this happening. Appx., Vol. II at 565. He also stated that Picerne's head safety officer for Fort Riley once observed the Knitters wearing shorts on a job. The safety officer "told [the Knitters] if he ever caught [them] wearing shorts again, [they] would be gone." *Id.*

c. *Work in specific Fort Riley neighborhoods and allegations of discrimination*

The Knitters worked in a variety of neighborhoods around Fort Riley. In three of these neighborhoods—McClellan, Ellis Heights, and, most notably, Peterson—the Knitters had conflicts with Picerne staff.

The Knitters assisted on turns in the McClellan neighborhood, where Chase Fleshman was the maintenance supervisor and Ben Kearns was the neighborhood manager. The Knitters worked at McClellan for a few weeks before they had a disagreement with Mr. Fleshman and Mr. Kearns. According to Ms. Knitter, after this

dispute, she refused to work at McClellan, in part because she was not paid for additional work she had performed beyond her flat rate assignments.[5]

The Knitters next worked in two other Fort Riley neighborhoods—Ellis Heights and Peterson. Both of these experiences also ended negatively.

In Ellis Heights, the neighborhood manager contends Ms. Knitter was dishonest and difficult to work with. The Knitters say their dispute with the Ellis Heights manager was based on a misunderstanding.

In Peterson, the Knitters worked with maintenance supervisor Rodney Hayworth. Ms. Knitter contends Mr. Hayworth sexually harassed her, repeatedly calling her a "dumb blonde" and suggesting Ms. Knitter had no place working as a handyman because she was a woman. Appx., Vol. I at 15. According to Ms. Knitter, Mr. Hayworth told her she should go home and "get laid" when she was in a bad mood, and repeatedly expressed "chauvinistic" opinions about women and their intelligence. Appx., Vol. II at 576. Ms. Knitter also alleges Mr. Hayworth had sexually graphic conversations with other men in front of her, causing her to feel uncomfortable. Appx., Vol. I at 15.

Ms. Knitter further alleges Mr. Hayworth paid her lower fees based on her gender. Although Ms. Knitter admits Picerne paid LGC handymen a flat rate based on the neighborhood and home being turned, she complained in a letter to Picerne managers

---

[5] Picerne claims the Knitters were dishonest and unruly and that it asked Mr. Lewis to stop sending the Knitters to McClellan. We accept Ms. Knitter's contrary account because she was the non-moving party before the district court.

-11-

after her termination that Mr. Hayworth assigned her to turns that paid less than others, and that Mr. Hayworth wanted to pay her less because she was a woman:

> When [a male handyman] could no longer work on Ft. Riley[, Mr. Hayworth] called us to do the handyman turns he was behind on. I don't remember the exact number but there were 8 or 9 that had to be done that week. When I told [Mr. Hayworth] we would have to turn down turns in Ellis for $200 ea to do turns for him for $125 each he told us he would make it up to us later. After the turns were done [Mr. Hayworth] must have forgotten the favor we did for him because he always wanted me to do work for less money than anyone else. In other words for less money than the MEN who worked for him. [Mr. Hayworth] never told me the turns in his neighborhood had been raised to $160 [when] I complained for months that $125 was not enough. After [Mr. Hayworth] and [Picerne Assistant Director of Maintenance Operations] Brian Lamb decided I could no longer work for Picerne the price was raised to $160. How convenient, now they can pay the men more money than they paid the woman for doing the same job.

Appx., Vol. II at 577.

Ms. Knitter also complained that Mr. Hayworth refused to pay the Knitters for work they did beyond the flat rate assignments. Specifically, the Knitters put in a bid of $500 to do additional handyman repairs on a flooded home in the Peterson neighborhood.[6] After the Knitters negotiated the bid, Ms. Knitter says Mr. Hayworth "started adding extra work that was not on the original list when he accepted the bid. He then told us the extra work was to be done for no extra money." *Id.* Ms. Knitter's complaint alleged that Mr. Hayworth's refusal to pay for the Knitters' additional work

---

[6] The record does not indicate if the $500 was to flow through LGC or be paid directly to the Knitters from Picerne.

was "[b]ecause of [Mr.] Hayworth's discriminatory view of women working in the field . . . ." Appx., Vol. I at 15.

Aside from their disputes with Mr. Hayworth in Peterson, the neighborhood manager in Ellis Heights, and the Picerne staff in McClellan, the Knitters otherwise enjoyed generally positive relationships with Picerne managers and supervisors. Michael Mann—maintenance supervisor for Ellis Heights[7]—stated in an affidavit that he "used [the Knitters] every chance [he] could" because of the quality of their work and demeanor. Appx., Vol. II at 521. Preston Buckland, a Picerne maintenance supervisor in the Historic Main Post neighborhood, thought the Knitters' work was "exceptional" and stopped using LGC after Ms. Knitter was terminated. Appx., Vol. II at 542. Finally, Galen Hansen—maintenance supervisor in the Warner neighborhood—testified the Knitters had done good work on the 20 jobs they had performed for him. He believed there were neighborhoods where a maintenance supervisor would use only Ms. Knitter for handyman services.

d. *Complaints of discrimination and termination*

During the time Ms. Knitter worked with Mr. Hayworth in the Peterson neighborhood, she complained several times to Picerne managers that Mr. Hayworth was harassing her and discriminating against her because she was a woman. In early October

---

[7] The person with whom the Knitters had a bad relationship at Ellis Heights was the neighborhood manager, not the maintenance supervisor.

2010, Ms. Knitter called Brian Lamb—Assistant Director of Maintenance Operations at Picerne—and again complained Mr. Hayworth was harassing her.

On or about October 15, 2010, Mr. Lamb called Mr. Lewis and asked him not to send Ms. Knitter to Fort Riley anymore. Mr. Lamb later stated in an affidavit that he made this request because Ms. Knitter was uncooperative, untimely, and had billed Picerne for work she had not performed. Ms. Knitter contends Mr. Lamb's request to Mr. Lewis was retaliation for her previous complaints of sexual harassment and gender-based pay disparity.

After receiving the phone call from Mr. Lamb, Mr. Lewis terminated Ms. Knitter's employment. He testified he had no work assignments available for Ms. Knitter outside of Fort Riley. Ms. Knitter contends Picerne effectively forced Mr. Lewis to let her go because Mr. Lewis did not have other clients for whom Ms. Knitter could have worked.

It is uncontroverted that Picerne did not know whether LGC had additional clients aside from Picerne. Picerne contends it was unaware Ms. Knitter would lose her job if Picerne no longer wanted her at Fort Riley.

e. *Vendor application*

In November 2010, Ms. Knitter—doing business as "Lisa's Handyman Service"—applied to Picerne for vendor status to provide handyman work. She submitted various forms to qualify. These forms listed Lisa's Handyman Service as a "subcontractor" and a "small business enterprise." Appx., Vol. I at 367-69.

The materials Ms. Knitter submitted to Picerne also included a confidentiality agreement between Lisa's Handyman Service, identified as the "bidder," and Picerne, identified as the "contractor." The confidentiality agreement applied regardless of whether the bidder is "awarded the Subcontract for which it is bidding." Appx., Vol. I at 370.

On December 7, 2010, Gary Bertrand, director of "Small Business/Subcontractor Recruitment" at Picerne, denied her business vendor status. Appx., Vol. I at 393. Mr. Bertrand's letter advised Ms. Knitter that Picerne was not adding "new subcontractors in the trades that your company performs." *Id.* The letter also noted Picerne must balance "the number of contractors that work for us with the amount of current and projected work that we have for them." *Id.*

Ms. Knitter contends she was denied vendor status as a result of discrimination complaints she had made to Picerne when she worked at Fort Riley as an LGC handyman.

B. *Procedural Background*

Ms. Knitter sued Picerne on November 28, 2011, alleging gender discrimination and sexual harassment in violation of Title VII. Specifically, Ms. Knitter alleged she was paid less than male counterparts and was fired in retaliation for her wage discrimination and sexual harassment complaints against Picerne. Ms. Knitter also alleged Picerne later denied her company vendor status in retaliation for her prior complaints.

Picerne moved for summary judgment on a variety of grounds, arguing in particular that it was not Ms. Knitter's "employer" and therefore could not be held liable under Title VII. Picerne also argued Ms. Knitter's application for vendor status was not an application for employment and therefore did not fall within Title VII's ambit.

On January 3, 2013, the district court granted summary judgment to Picerne. It concluded Ms. Knitter was not an employee of Picerne and therefore could not bring her wage discrimination and retaliatory termination claims. It also decided Ms. Knitter's claim of retaliatory denial of vendor status failed because her application to be a vendor was not an application for employment. The district court did not reach the merits of Ms. Knitter's Title VII claims or address whether Ms. Knitter had provided sufficient evidence of wage discrimination or retaliatory motive.

## III. DISCUSSION

### A. *Standard of Review*

We review the district court's grant of summary judgment to Picerne de novo, applying the same legal standard as the district court. *See Cillo v. City of Greenwood Village*, 739 F.3d 451, 461 (10th Cir. 2013); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

We must view the evidence in the light most favorable to Ms. Knitter, the nonmoving party. *Tabor*, 703 F.3d at 1215. Therefore, we must resolve "all factual disputes and reasonable inferences in [her] favor." *Cillo*, 739 F.3d at 461.

Summary judgment must be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

As the moving party, Picerne must show the absence of a genuine dispute. In evaluating this issue, we must examine the evidence Ms. Knitter has put forth to make out her Title VII claim. Summary judgment is appropriate where the moving party has shown "the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which [he or] she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

We review de novo legal questions of statutory interpretation—in this case, the legal test to determine the definition of "employee" under Title VII. *See, e.g.*, *United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014). Whether an entity actually satisfies this definition under the appropriate test, however, "is a fact issue for the jury." *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1221 (10th Cir. 2002) (en banc).

B. *Legal Background*

-17-

Title VII of the Civil Rights Act of 1964 makes it unlawful for an "employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on account of sex.  42 U.S.C § 2000e-2(a)(1); *see Tabor*, 703 F.3d at 1216.  An employer also may not "discriminate against any of his [or her] employees . . . because [the employee] has opposed any [unlawful employment] practice."  42 U.S.C. § 2000e-3(a); *see Tabor*, 703 F.3d at 1219 ("Title VII forbids retaliation against an employee because she has opposed any practice made unlawful by Title VII." (quotations omitted)).

Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees."  42 U.S.C. § 2000e(b).  An "employee," in turn, is "an individual employed by an employer."  *Id.* § 2000e(f).

## C. *Analysis*

Ms. Knitter appeals the district court's grant of summary judgment to Picerne on her claims of (1) wage discrimination, (2) retaliatory termination, and (3) retaliatory denial of her vendor application.  We affirm the district court on all claims.

### 1. **Wage Discrimination and Retaliatory Termination Claims**

Before we can address whether Ms. Knitter has made out a prima facie case of wage discrimination or retaliatory termination, we must first decide whether Picerne has shown she has provided insufficient evidence for a reasonable jury to conclude Picerne was her "employer" for purposes of Title VII.  Because we affirm the district court's

conclusion that Picerne has not shown she has not, we address both claims at once and limit our inquiry to the threshold issue of whether Picerne was Ms. Knitter's employer.

a. *Title VII employment tests*

To make out a prima facie case of either wage discrimination or retaliatory termination under Title VII, a plaintiff must first prove the defendant was her employer. *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993). If a plaintiff cannot meet her burden to prove the defendant was her employer, her wage discrimination and retaliatory termination claims necessarily fail. *Lockard*, 162 F.3d at 1069.

Factfinders must decide whether a defendant is an employer for purposes of Title VII when doubts exist as to (1) whether a plaintiff is an employee or an independent contractor, or, alternatively, (2) which one(s) of multiple individuals or entities is (are) the plaintiff's employer. *See generally Bristol*, 312 F.3d at 1217-18.[8] Depending on the situation, this circuit chooses among three different tests to determine whether a defendant is an employer depending on the situation: (i) the hybrid test; (ii) the joint

---

[8] *Bristol* involved claims asserted under the Americans with Disabilities Act ("ADA"), not Title VII. But the *Bristol* court noted that the two statutes define "employee" identically, and it relied on Title VII cases in its articulation of the various employment tests. *See Bristol*, 312 F.3d at 1217-18. Its analysis and holding are therefore relevant here. *See Sandoval v. City of Boulder*, 388 F.3d 1312, 1323 (10th Cir. 2004) (applying *Bristol* to Title VII claims).

-19-

employer test; and (iii) the single employer test.  *Id.*  For context, we briefly review these three tests before proceeding to apply the joint employer test in this case.

### i. The hybrid test

We commonly use the "hybrid test" to distinguish an employee from an independent contractor.  *See Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir. 1992).  The "hybrid" test combines two types of analysis:  (1) a common law inquiry asking whether an entity controls its workers in an employer-employee relationship, and (2) the "economic realities test," which asks whether the worker is in business for himself "as a matter of economic fact."  *Id.*  "Although the hybrid test looks at the economic realities of the situation, the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance."  *Id.* (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979)).

Although this circuit originally used the hybrid test only to differentiate employees and independent contractors, *see id.*, we later began using the hybrid test also to determine "which of two entities was a plaintiff's 'employer' under Title VII,"  *Bristol*, 312 F.3d at 1217; *see, e.g.*, *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1328-29 (10th Cir. 2002).  In our 2002 en banc decision in *Bristol v. Board of County Commissioners*, however, we clarified that the joint employer test, not the hybrid test, is the appropriate test to use when an employee of one entity seeks to hold another entity liable as an employer.  *See Bristol*, 312 F.3d at 1218.

### ii. The joint employer test

Under the joint employer test, two entities are considered joint employers if they "share or co-determine those matters governing the essential terms and conditions of employment." *Id.* (quotations omitted). Both entities are employers if they both "exercise significant control over the same employees." *Id.* (quotations omitted). "An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer within the scope of Title VII." *Sizova*, 282 F.3d at 1330 (quotations omitted).

"Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances . . . ." *Bristol*, 312 F.3d at 1219. Additional factors courts consider for determining control under the joint employer test include the ability to "promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurance, taxes and the like." *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007) (quotations omitted).

### iii. The single employer test

Finally, the single employer test permits "a plaintiff who is the employee of one entity . . . to hold another entity liable by arguing that the two entities effectively constitute a single employer." *Bristol*, 312 F.3d at 1218. "Although [the joint employer and single employer] tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an

-21-

integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities." *Id.*

Unlike the joint employer test, which focuses on the relationship between an employee and its two potential employers, the single employer test focuses on the relationship between the potential employers themselves. "Courts applying the single-employer test generally weigh four factors: '(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control.'" *Bristol*, 312 F.3d at 1220 (quoting *E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 571 (6th Cir. 1984)).

b. *Terms and conditions of Ms. Knitter's employment under the joint employer test*

The parties agree, as do we, that we should apply the joint employer test to determine whether a reasonable jury could find Picerne was Ms. Knitter's employer between March 2010 and October 2010.[9] No one has alleged that Picerne and LGC

---

[9] Ms. Knitter argues the district court applied the wrong test in granting summary judgment to Picerne. She contends that although the district court stated it would apply the joint employer test, it improperly conflated its analysis with the hybrid test and relied on a court decision applying the hybrid test.

We disagree. In its order granting summary judgment, the district court said it would examine "the facts concerning whether Picerne exercised 'significant control' over the terms and conditions of [Ms. Knitter]'s employment." Aplt. Appx., Vol. II at 627. This is precisely what the joint employer test asks. The district court examined various factors, including the ability to terminate Ms. Knitter, discipline, daily supervision, and payment, and concluded based on this analysis that "no reasonable jury could conclude that Picerne exercised the requisite control over [Ms. Knitter] to be deemed [Ms. Knitter]'s employer." *Id.*

Continued . . .

constitute a single employer, and the parties do not dispute that Ms. Knitter was an

employee of LGC rather than an independent contractor to any entity. Both the single

_____

Cont.

  The district court stated its conclusion was "based in part on the Tenth Circuit's decision in *Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998)." *Id.* at 628. *Zinn* is a pre-*Bristol* case that applied the hybrid test to determine that the plaintiff, an employee of a private corporation that had contracted with the Kansas Department of Corrections to provide medical services to inmates, was not also an employee of the Department for Title VII purposes. *Zinn*, 143 F.3d at 1355.
  The district court recognized *Zinn* is a hybrid test case, but found its analysis "nonetheless . . . relevant to" the discrimination in the present case, "particularly as the Circuit in *Zinn* was faced with arguably joint employers and, in that regard, analyzed the amount of control exercised by the Department over Ms. Zinn's work." Aplt. Appx., Vol. II at 628.
  The district court compared the facts of *Zinn* to the present case. It noted plaintiff in *Zinn* argued the Department effectively terminated her employment when it requested the private corporation remove her from assignment to the Department. The Tenth Circuit rejected that argument, holding the Department's ability to request removal of personnel did not render Ms. Zinn an employee of the Department because the private corporation for which she worked "alone retained the ability to terminate" her. *Zinn*, 143 F.3d at 1358. The district court also pointed out that in *Zinn*, the Department's own manuals treated the employees of contractors as Department employees; the Department acted on an internal EEO complaint Ms. Zinn filed as if she were its employee; the Department participated in hiring Ms. Zinn; and the Department supervised her daily work. Aplt. Appx., Vol. II at 629 (citing *Zinn*, 143 F.3d at 1361-62 (Briscoe, J., concurring)).
  The district court concluded that it was "particularly persuaded by the Circuit's opinion in *Zinn* because the facts tending to show joint employment in *Zinn* were much stronger than those here and the Circuit nonetheless affirmed the grant of summary judgment [to the defendant]." Aplt. Appx., Vol. II at 629.
  We do not believe the district court improperly relied on *Zinn*. Although its invocation of *Zinn* may have been confusing, the district court's order as a whole indicates it did rely on the joint employer test, as it stated it would.
  In any case, because our standard of review is de novo, we are free to apply the proper test here, and we may affirm on any ground supported by the record. *See Eller v. Trans Union, LLC*, 739 F.3d 467, 476 (10th Cir. 2013).

employer and hybrid tests are thus inapplicable. *See Bristol*, 312 F.3d at 1217-18 (clarifying that the hybrid test applies only to determine whether a worker is an employee or an independent contractor and explaining the difference between the joint employer and single employer tests). Instead, the question is whether Picerne—a separate entity from LGC—can also be considered Ms. Knitter's employer. We therefore apply the joint employer test. *See Sizova*, 282 F.3d at 1330 ("An independent entity with sufficient control over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII." (quotations omitted)).

We agree with the district court that, applying the joint employer test to the facts viewed in the light most favorable to Ms. Knitter, no reasonable jury could find Ms. Knitter was an employee of Picerne. Picerne has shown Ms. Knitter has not presented enough evidence for a reasonable jury to conclude Picerne and LGC "share[d] or co-determine[d] those matters governing the essential terms and conditions of [Ms. Knitter's] employment." *Bristol*, 312 F.3d at 1218; *see also Lockard*, 162 F.3d at 1069 (plaintiff has the burden to prove the defendant was her employer).

The following shows that (i) Picerne did not have the authority to terminate Ms. Knitter's employment; (ii) Picerne did not pay Ms. Knitter directly; and (iii) Picerne did not have the authority to supervise and discipline Ms. Knitter beyond the confines of a vendor-client relationship. Taking these factors together, we conclude Picerne treated Ms. Knitter as a vendor providing a service rather than as an employee.

       i.   <u>Authority to terminate</u>

-24-

Our case law provides limited instruction as to which "terms and conditions of employment" are considered "essential" for purposes of the joint employer test, though *Bristol* makes clear that "[m]ost important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances . . . ." 312 F.3d at 1219. We also noted in *Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004), that the ability to terminate was the most important factor in deciding the City of Boulder and the executive committee of a regional communications center run by the city and county were not joint employers because the City exercised only limited control over employees of the executive committee, had no impact on hiring decisions, and lacked the ability to terminate the committee's executive director.[10]

Although the ability to terminate may not be the sole factor courts should consider under the joint employment test,[11] it is particularly compelling in this case and weighs heavily against Ms. Knitter. No reasonable jury could find Picerne had the ability to terminate her employment.

Ms. Knitter argues Picerne was able to fire her because, by requesting that she no longer be sent to Fort Riley, Picerne effectively forced Mr. Lewis to terminate her

---

[10] In addition, at least one district court in our circuit has indicated the ability to terminate is the dispositive factor under the joint employment test. *See Blagg v. The Tech. Group, Inc.*, 303 F. Supp. 2d 1181, 1185 (D. Colo. 2004) ("As discussed in *Bristol*, the determining factor is the right to make termination decisions . . . .").

[11] Picerne's counsel conceded as much at oral argument. *See* Oral Arg. Recording (21:41-22:12).

employment. As the record indicates, however, Picerne was unaware that all or almost all of LGC's business came from Picerne. LGC had additional clients at times aside from Picerne, and if it still had those clients, Picerne's request to have Ms. Knitter removed from Fort Riley might well have resulted in her reassignment to a different client and not termination.

At any rate, Picerne lacked the power to fire Ms. Knitter; it at most could request that LGC no longer assign Ms. Knitter to work at Fort Riley. Picerne managers repeatedly testified they did not believe they had the power to fire vendor handymen and instead were required to direct issues with handymen to the vendor companies. In Ms. Knitter's case, Mr. Lamb spoke to Mr. Lewis and requested that LGC no longer send Ms. Knitter to Fort Riley. He said nothing regarding Ms. Knitter's continued LGC employment or her ability to work for other LGC clients.

There is therefore no genuine dispute that control over the most important condition of Ms. Knitter's employment under the joint employer test—the ability to terminate her employment—lay solely with LGC. Picerne did not share in this power as a joint employer.

ii. Payment

Although the ability to terminate an employee is the most important factor indicating an employer is a joint employer, we may also consider whether Picerne had control of Ms. Knitter's "records, including payroll, insurances, taxes and the like." *Butterbaugh*, 479 F. Supp. 2d at 491 (quotations omitted).

LGC had almost exclusive control over Ms. Knitter's personnel records and payment. LGC provided Ms. Knitter with W-2 forms, withheld taxes from her income, and issued Ms. Knitter's paychecks.

Ms. Knitter argues LGC was merely a "pass-through" in Picerne's business model because all her payments truly came from Picerne itself and were subject to Picerne's decisions. Picerne set flat rates for vendor handyman services, and in this sense indirectly determined Ms. Knitter's income. But Picerne had no control over how much of Ms. Knitter's paychecks LGC deducted for itself (15 percent). And Picerne never paid Ms. Knitter for turns directly or negotiated rates with her. Ms. Knitter admits the flat rates Picerne set for turns did not vary based on the particular handyman.

The record is unclear regarding the additional payment Mr. Hayworth allegedly negotiated with the Knitters for work beyond the flat rate on a flooded unit in the Peterson neighborhood. Ms. Knitter states she and her husband put in a bid for $500 to do the additional work, but she does not specify whether this one-time payment would have gone through LGC or directly to the Knitters from Picerne. *See* Appx., Vol. II at 577.

Even if the Knitters negotiated this rate with Mr. Hayworth and received payment from Picerne, any such exchange was anomalous and not indicative of an employer-employee relationship. Ms. Knitter's paychecks came from LGC, which also maintained her personnel records, including her W-2 forms. No reasonable jury could conclude Picerne shared control over Ms. Knitter's payment and personnel file with LGC.

### iii. Authority to supervise and discipline

In addition to considering Picerne's authority to terminate Ms. Knitter and whether it paid her and maintained her records, we also look to "day-to-day supervision of employees, including employee discipline." *Butterbaugh*, 479 F. Supp. 2d at 491 (quotations omitted). Some degree of supervision and even discipline is to be expected when a vendor's employee comes on another business's work site, but the limited supervision and discipline here weigh against regarding Picerne as Ms. Knitter's joint employer.

### (a) Supervision

Ms. Knitter argues Picerne supervised her work on a daily basis by demonstrating how tasks were to be performed and instructing her to redo them if she had done them unsatisfactorily. She also points out she worked on Picerne premises, took her assignments from Picerne, was required to submit to Picerne's dress code, and notified Picerne when she was going to be absent from work.

She analogizes the foregoing to a 2004 district court case applying the joint employer test to deny a motion for summary judgment in which the defendant argued it was not the plaintiff's employer. *See Hurde v. Jobs Plus-Med*, 299 F. Supp. 2d 1196 (D. Kan. 2004). The plaintiff in *Hurde* was hired by Jobs Plus, a job placement agency, "for placement at" the defendant's business, A-Plus. *Id.* at 1201. Although Jobs Plus issued the plaintiff's paychecks, the plaintiff worked on A-Plus's premises, and A-Plus supervised and trained him and determined his hours, days of work, and rate of pay. The

-28-

plaintiff was required to notify A-Plus when he was going to be absent from work, and all of his job skills were acquired through on-the-job training with A-Plus. *See id.* at 1209.

But unlike the plaintiff in *Hurde*—who was hired specifically "for placement" at A-Plus, *id.* at 1201—Ms. Knitter never applied to work specifically at Picerne, and Picerne did not control Ms. Knitter's payment, as discussed above. Picerne also supervised Ms. Knitter less formally and to a lesser extent than did the defendant in *Hurde*.

Picerne's supervision of the Knitters' work was limited and largely focused on workplace safety issues, including the dress code and safety harness requirements. Because the Knitters worked on Picerne premises, Picerne naturally would be concerned about their safety, even if only for liability purposes, just as they would for any employee or non-employee on premises.

Picerne managers supervised the Knitters' daily work to the extent they provided instruction on how to perform certain tasks and notified the Knitters if their work did not meet Picerne's standards. But this supervision did not extend to such matters as training or formal performance evaluations provided to employees, again unlike in *Hurde*. *See id.* at 1209. Picerne's supervision was limited to directing the Knitters on how to perform certain tasks to its satisfaction, much like an individual hiring a moving company to move his or her belongings into an apartment might direct the movers on where to place items or how to protect items that are particularly fragile. In short, the level of

supervision was consistent with a client-vendor relationship, not an employer-employee relationship.

(b) Discipline

Ms. Knitter also argues Picerne had the authority to discipline her. She points out that Picerne managers notified the Knitters when their work was unsatisfactory. On one occasion, according to Mr. Knitter, a Picerne manager told the Knitters they would "be gone" if they were ever caught wearing shorts again. Appx., Vol. II at 565. Mr. Knitter also contends Picerne would fine the Knitters if they were caught not wearing safety harnesses. *Id.*[12]

But Ms. Knitter has provided no evidence that any Picerne manager or employee ever exercised any authority to discipline her. On the contrary, Picerne managers testified they complained about Ms. Knitter to Mr. Lewis but did not have the power to discipline Ms. Knitter. Even if Picerne threatened to discipline her—as the manager who warned the Knitters not to wear shorts allegedly did—this does not mean it had the actual authority to do so or that it did discipline her. Likewise, even if Picerne did collect fees for not wearing a harness to deter unsafe workplace behavior, it does not follow that Picerne had authority to discipline Ms. Knitter regarding other matters.

---

[12] It is unclear, however, whether the Knitters ever actually *were* fined, or simply speculated that they might be.

In short, the modicum of control Picerne exerted over the Knitters' daily work, including supervision and discipline, did not suffice to render it a joint employer of the Knitters for Title VII purposes.

* * *

Taking together the "essential terms and conditions of employment," *Bristol*, 312 F.3d at 1218, including the authority to terminate, pay, supervise, and discipline, *see Butterbaugh*, 479 F. Supp. 2d at 491, we conclude Picerne exerted insufficient control over these matters to be her joint employer. The most important factor—Picerne's lack of authority to terminate Ms. Knitter, *see Bristol*, 312 F.3d at 1219—weighs heavily against Picerne being a joint employer, as does Picerne's not paying her. The supervision and discipline factors also support Picerne, and to the extent that Picerne did have authority to supervise elements of Ms. Knitter's work and enforce safety rules, this limited control is not a sufficient basis for a reasonable jury to find that, taking all the factors together, Picerne was Ms. Knitter's joint employer.

LGC was a vendor and Picerne was a client. Picerne exerted the sort of control over LGC handymen that one would expect a client to exert over its vendors—supervising limited aspects of their work, providing them with instruction on particular tasks, and furnishing some supplies when necessary.

Picerne regularly uses dozens of vendors in its daily operations. These vendors are not all "employees" of Picerne for Title VII purposes merely because Picerne notifies them what services it desires and requires compliance with its safety rules for them to

-31-

work on its premises. Picerne has met its burden to show it is entitled to summary judgment under Federal Rule of Civil Procedure 56(a) because it has shown that Ms. Knitter has not offered sufficient facts for a reasonable jury to find Picerne was her joint employer rather than a client of LGC. *See Lockard*, 162 F.3d at 1069.

Because we conclude Ms. Knitter was not an employee of Picerne, we must affirm the district court's grant of summary judgment to Picerne. In doing so, we express no view on the merits of Ms. Knitter's claims if Picerne had qualified as an employer under Title VII. We hold only that to the extent Ms. Knitter faced discrimination or harassment at her job, Title VII does not furnish her with a remedy against Picerne because it was not her "employer" within the meaning of the statute.

2. **Denial of Vendor Status Claim**

Because no reasonable jury could find that Ms. Knitter was an employee of Picerne, we conclude her claim based on denial of vendor status must fail alongside her claims of wage discrimination and retaliatory termination.

a. *Title VII standing*

Title VII's protection against unlawful retaliation applies to "employees or applicants for employment." 42 U.S.C. § 2000e-3(a). Because Title VII is a remedial statute that must be construed broadly, courts have clarified that "*former* employees" are included in the definition of "employees" for purposes of this provision. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264 (10th Cir. 2007); *see also Robinson v. Shell Oil*, 519 U.S. 337, 346 (1997).

-32-

For this reason, a former employee may bring a retaliation claim against an employer for any retaliatory adverse actions the employer takes *after* the former employee no longer worked for the employer, such as refusing to hire the former employee as an independent contractor. *See Jencks*, 479 F.3d at 1265. A plaintiff who has never been employed by the defendant, in contrast, must prove that he or she was an "applicant[] for employment." 42 U.S.C. § 2000e-3(a). Title VII does not protect applicants for independent contractor positions if they are not former employees of the defendant. *See, e.g.*, *Alam v. Miller Brewing Co.*, 709 F.3d 662, 667-68 (7th Cir. 2013).

b. *Ms. Knitter's application for vendor status*

Because we hold Ms. Knitter was never an employee of Picerne, Ms. Knitter is required to show she was an "applicant[] for employment" with Picerne to establish a claim for retaliatory rejection of her vendor application under Title VII. 42 U.S.C. § 2000e-3(a).

Ms. Knitter cannot satisfy this burden. The record contains no indication Ms. Knitter applied to be a Picerne employee. On the contrary, Ms. Knitter's counsel conceded at oral argument that her business, Lisa's Handyman Service, sought a contractor-subcontractor relationship with Picerne. *See* Oral Arg. Recording 12:47-12:53. We agree. The "pre-qualification package" that Ms. Knitter submitted to Picerne listed Lisa's Handyman Service as the "subcontractor" submitting the package. Appx., Vol. II at 367. It also contained a confidentiality agreement that identified Picerne as a "contractor" and Lisa's Handyman Service as the "bidder" for a "subcontract." *Id.* at

-33-

370.  Finally, Picerne's written response to Ms. Knitter's application came from Picerne's director of "Small Business/Subcontractor Recruitment," and it notified Ms. Knitter that Picerne was not accepting new subcontractors in handyman services at the time.  *Id.* at 393.  Because Ms. Knitter was applying to be a Picerne subcontractor and not an employee, her claim of retaliatory denial of vendor status is not valid under Title VII and must fail.

### III.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to Picerne.