FILED
United States Court of Appeals
Tenth Circuit

November 9, 2022

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENNTH CIRCUIT

---

STACEY WRIGHT,

      Plaintiff - Appellant,

v.

PORTERCARE ADVENTIST
HEALTH SYSTEM, a Colorado
nonprofit corporation, d/b/a Centura
Health - Castle Rock Adventist
Hospital,

      Defendant - Appellee.

No. 21-1038

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-01067-WJM-STV)**

---

Richard P. Barkley (Jeanine M. Anderson and Claire E. Sweetman, with him on the briefs), Anderson Barkley, LLC, Denver, Colorado, for Plaintiff - Appellant[*].

M. Brian Sabey (Mark L. Sabey with him on the brief), Hall, Render, Killian, Heath & Lyman, P.C., Denver, Colorado, for Defendant - Appellee.

---

Before **McHUGH**, **MURPHY**, and **ROSSMAN**, Circuit Judges.

---

[*]Richard P. Barkley argued on behalf of Appellant. An order was entered on April 21, 2022, granting the appellant's motion for Mr. Barkley to withdraw as counsel. Claire E. Sweetman also filed a motion to withdraw as counsel and that motion was granted on February 2, 2022.

**MURPHY**, Circuit Judge.

## I.  INTRODUCTION

Stacey Wright worked as the charge nurse in the cardiac catheterization lab ("cath lab") at Castle Rock Adventist Hospital ("Castle Rock"), a unit of the Portercare Adventist Health System ("Portercare").  After she was denied a transfer within Portercare and was terminated from her position at Castle Rock, Wright brought Title VII claims for discrimination and retaliation.  The district court granted Portercare summary judgment, concluding it advanced legitimate, nondiscriminatory reasons for its employment decisions and Wright failed to adduce evidence supporting a finding of pretext.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

## II.  BACKGROUND

### A.  Factual Background

#### 1.  Management Transition in the Cath Lab

Wright began working in the cath lab in 2013 and became its charge nurse within one year.  From 2012 to mid-2017, Russ Royer was the cath lab's manager and Wright's direct supervisor.  Under Royer's supervision, Wright received positive performance reviews.  Royer averred that Wright was "one of the most skilled nurses that [he] ever worked with in all [of his] years in the healthcare

-2-

industry, and it [was] difficult for [him] to find anything to complain about when it comes to [her] work performance." After Royer left his position, cath lab staff and Castle Rock physicians encouraged Wright to apply to take his place. Although Wright applied to become the cath lab's manager, the position remained vacant while the department's leadership underwent a change.

In fall of 2017, the cath lab came under the control of Carol Pontius. Pontius hired Suzanne Parker as the cath lab's director and Julie Lombard as the lab's manager. The decision to hire Lombard frustrated the lab's four permanent staff members: Frank Przymus, John West, Ryan Voegle, and Wright. In particular, Wright found it difficult to accept Lombard as her supervisor and admitted she was "less than" "very friendly and open" towards Lombard or willing to assist Lombard's transition as she became cath lab manager. The tension between Lombard and Wright did not escape the attention of other cath lab staffers. West averred that the decision to hire Lombard and to task Wright with Lombard's training caused "obvious rifts" and "a tense vibe in the room."[1]

---

[1]West averred as follows:

[Pontius] asked [Wright] to train [Lombard] about the Cath Lab. That did not seem fair to me, to hire [Lombard] and thereby suggest that [Wright] was not capable of running the Cath Lab, but then to ask [Wright] to train [Lombard] how to do the job. It was not a good situation, and there were obvious rifts between [Wright] and [Lombard] and between [Wright] and [Pontius].

(continued...)

Wright testified she and Lombard "had very few conversations," and

acknowledged she did not think "there's anybody in this whole hospital that

doesn't know how I'm disappointed in the current state of our department."[2]

### 2. Incidents Underlying Adverse Employment Actions

#### a. Data Reports

The physicians served by the cath lab expected the lab to prepare several

monthly data reports. During his tenure, Royer prepared the bulk of these

reports.[3] After Royer left Castle Rock, Clint Watson, then-director of the cath

---

[1](...continued)
> [Wright] did not get along well with [Lombard]. When they were together there was a tense vibe in the room. When [Lombard] would come in, [Wright] would be very quiet, which was not her usual self. Their interaction was minimal. . . .

West swore out a second affidavit clarifying some of the averments set out in his original affidavit. He did not, however, change his testimony about the tension between Wright and Lombard, nor his testimony that Wright was generally quiet in Lombard's presence.

[2]On October 30, 2017, Wright emailed Jodi Parrish, a Castle Rock human resources official, to set up a meeting between Parrish and the cath lab's permanent staff. Wright requested that the meeting take place without the cath lab's management team. Parrish's notes regarding that meeting indicate the leadership change left the staff with "a lot of mistrust." The staff did not "even want to talk to [Lombard]" and indicated it did not "make sense to them" that Wright, with her fifteen years of experience, was passed over in favor of Lombard, who had no cath lab experience.

[3]According to Wright, "Royer delegated to [her] the data reporting for NCDR Databases as it was a very time consuming task." She also testified she was in charge of "ACS" data abstraction "from day one."

lab, took over primary responsibility for the data reports. In two separate months while Watson was responsible for the reports, he asked for Wright's help to compile the reports. Although she "struggled," she and Watson were able to work together to achieve the task. When the cath lab came under Pontius's control, Parker replaced Watson as the cath lab's director.

On October 24, 2017, Wright sent a series of emails to Lombard about the data reports.[4] Lombard attempted to communicate with Wright about the data reports by text. Despite her expressed preference for text messages as "the best way to communicate with her," Wright did not respond to Lombard's texts. On

---

[4]The bodies of the relevant emails state as follows:

●Attached is the ACS data spreadsheet. This information needs to be sent to Susan Beech each month. I try to get it to her as soon as I can since she has to collect the info from all South Denver facilities. I have reported out up until September 2017, so she will need October data at the beginning of November.

Let me know if you have any questions and I can try to assist you!

●Attached is the EP dashboard for the SDG. This is something Brenda Yost will ask you to provide monthly—similar to the ACS dashboard.

●I know you had mentioned in the past that you might be interested in taking over the NCDR databases. If this is still something that interests you, let me know when you are ready to take them on. In this regard, I have a lot of experience and would be able to assist you as needed.

November 6th, approximately two weeks after receiving Wright's emails and after

the October reports were due, Lombard replied to Wright's emails with a trio of

responses, each of which asked Wright to handle the reports until Lombard was

prepared to undertake those duties.[5]  The next day, Wright met with Lombard,

Parker, and human resources director Jodi Parrish to clarify expectations about

communications between Wright and Lombard and to discuss Wright educating

Lombard about the preparation of the required data reports.  The meeting

"focused on transitioning the ACS abstracting and EP dashboard to [Lombard],

---

[5]The bodies of the relevant email responses state as follows:

●It may be a bit before I feel comfortable taking over the databases.  Until then, I'd like to have you keep them as you are experienced!

I'd like to work on this slowly.  [C]ould we have a standing weekly appointment to help get me up to speed?

I'd like to suggest Tuesdays from 1-2.

Let me know what you think.

●I'd like to work on this slowly with you as well.  Until I'm able to get up to speed, I'd like to have you keep them as you are experienced!

Could we go over the ACS/EP dashboard when we go over the NCDR information during our weekly meeting?

●Would you kindly report to Brenda on the October's data? I'm unsure of the process, but look forward to learning.

which [Wright] had assisted [Watson] with during the interim absence of a manager after [Royer] left." Lombard involved her supervisor and a human resources representative because "[t]here was some issues with her responding to my texts and not coming down to teach me. And so I just wanted to have others involved in the meeting." Wright did not complete any data reports for October, November, or December of 2017.

### b. OR/PACU[6] Assistance

At 8:22 a.m. on the morning of December 11, 2017, Lombard sent Wright a text message directing her, along with the other cath lab employees, to provide assistance in the OR: "The OR needs help today with admission vitals and IV's[.] Would you all please go over to help?" One minute later, Wright responded "Ok." Shortly thereafter, Wright checked in with the PACU and "learned that their needs were going to be primarily in the afternoon." Wright decided to take an early lunch break and go pick up her daughter's Christmas present. Accordingly, at 8:31 a.m., Wright texted Lombard that she was "running over to Walmart. Be right back." At 8:44 a.m., Lombard texted Wright as follows: "Btw when you get back come see me . . . ." After sending this text, Lombard spoke to the PACU charge nurse, who said no one from the cath lab had come over to

---

[6]The terms OR for operating room and PACU for post-anesthesia care unit are used interchangeably by the parties.

help.[7]  At 8:53 a.m., Lombard directed Wright by text as follows: "Come see me in [Parker's] office let me know when ur back from Walmart."

Wright returned to Castle Rock and clocked back in at 9:03 a.m.  Upon her return, Wright bumped into Watson in a hallway.  Rather than proceeding directly to Parker's office as Lombard had requested, Wright spent almost thirty minutes visiting with Watson.  At approximately 9:30 a.m., Wright proceeded to Parker's office and met with Lombard and Parker.  Lombard and Parker questioned Wright about running the errand.  As regards the meeting, Wright averred as follows:

> I explained that it had been common for [cath lab staff] to run short errands after ensuring we had coverage and letting our manager know. . . .  I told them to check with . . . [Przymus] and [West], who would confirm this practice.  I then asked why I was being treated differently than those male employees, and whether they . . . believed that the male staff members just never ran errands. . . .  [Parker] confirmed that she knew that the male employees ran errands, but did not notify management when they did so, and that I was the only one who ever provided notice before leaving for an errand.[8]

---

[7]In her contemporaneous version of events, documented in an email she sent to Parrish at 10:51 on the morning of December 11, Wright made no mention of checking in with the PACU before she left for Walmart.  In later-created documents, Wright has variously claimed that she actually checked in with the PACU and that she simply had an informal conversation in the break room with a PACU nurse.  Taking the facts in the light most favorable to Wright, as we must in reviewing the district court's summary judgment ruling, we assume for purposes of this appeal that Wright did in fact check in with the PACU.  Nevertheless, it is undisputed that the PACU charge nurse told Lombard that none of the cath lab employees had come to help.

[8]The evidence also demonstrates, however, that to Parker's and Lombard's knowledge, no other cath lab staffer had ever left to run a personal errand while a

(continued...)

-8-

That same day, Lombard drafted a proposed corrective action at the level "written warning" and submitted it to human resources.[9]  When human resources generalist Allyssa Gleason reviewed the draft written warning, she expressed concern about making sure Wright was treated consistently with other cath lab employees.  In particular, Gleason noted Castle Rock needed "to be careful that we don't only discipline [Wright] if others have been doing it."  Gleason also noted, however, that Parrish "mentioned adding some recent behavioral issues" to the written warning and solicited examples of such conduct.  On December 21, 2017, Lombard talked to the other members of the cath lab about their practice of running errands during the workday, telling them that "staff should not be leaving the premises during business hours."

_____

[8](...continued)
specific assignment from a manager was pending.

[9]In her appellate brief, Wright complains that Lombard drafted this proposed corrective action "without verifying Wright's statement that she had contacted PACU" before she went to Walmart.  Wright cites no evidence, however, that she ever made such a statement to Lombard.  According to both Wright's and Lombard's descriptions of the 9:30 a.m. meeting, Wright only told Lombard and Parker that all cath lab employees ran errands during the work day and other members of the cath lab could have covered for her.  None of the various recountings of this meeting include any reference to Wright explaining that she checked in with the PACU before leaving, and Lombard specifically testified that she was never told Wright had spoken with anyone in the PACU before she left on her errand.

### c. Training Temporary Employees

Non-permanent personnel, "travelers," periodically visited the cath lab and received an orientation from its staff.  Prior to the expected arrival of travelers on December 18, 2017, Ryan Voegle notified the other staff members that he had been asked to provide orientation.  On the Friday before the travelers were expected to arrive, Lombard noted on the cath lab's whiteboard that travelers would be arriving in the department on the afternoon of December 18, 2017.  Although Wright acknowledges she had notice of the arrival of travelers from the whiteboard, she emphasizes she was never asked to provide orientation and orienting travelers is not a responsibility of the charge nurse.  According to Lombard, on the other hand, she specifically asked Wright to aid in the orientation of the travelers on the morning of the 18th.  Wright did testify that in the past she had generally oriented traveler nurses and Przymus had oriented the "tech" travelers.  Ultimately, Wright did not participate in the orientation of the traveler nurse who arrived on December 18, 2017.  Instead, Wright was absent from the cath lab during this time frame and did not communicate with management about her absence.  *See infra* n. 13 (noting Wright's complete absence from the cath lab without explanation during the orientation of the travelers).

### 3. Denial of Transfer

After the errand incident, Wright decided to seek a transfer within the Portercare network. Human resources generalist Gleason knew by December 15, 2017, that Wright was scheduled to interview for a position at Parker Adventist hospital. Neither Gleason nor anybody else associated with Portercare advised Wright she might be ineligible for a transfer. Indeed, Gleason asked a human resources employee at Parker Adventist to keep her in the loop so Castle Rock could "have a good plan in place for sustaining staffing in our" cath lab in case Wright was offered the position. This was true even though Gleason had commented on Lombard's draft written corrective action on December 11, 2017. Portercare employees are eligible for a transfer if they have not had a written warning within the last six months. Wright believed she met this requirement and asserts she had no reason to be aware she was ineligible to transfer. Wright was offered the position at Parker Adventist. On December 20, 2017, Wright sent a message to Parker, Lombard, and Parrish indicating she intended to transfer to Parker Adventist. Sondra Davis, Portercare's regional vice president of human resources, advised Parrish to inform Wright a corrective action was in the works that would make Wright ineligible for a transfer. Accordingly, Parrish sent Wright an email on December 21, 2017, "clarify[ing]" that Wright was ineligible:

> You need to be aware [Castle Rock] had already decided, prior to
> your email notice, to place you on a corrective action due to your

conduct these past couple months.  Because the corrective action is already in the works, you are ineligible to transfer at this time. Leadership will be meeting with you soon to review the corrective action and set expectations.

Ultimately, Parrish, Davis, and Todd Folkenberg, Castle Rock's chief executive officer, made the decision to disallow Wright's request to transfer.

The same day she was informed she would not be allowed to transfer to Parker Adventist, Wright initiated a complaint with the Integrity Helpline.[10] Integrity Helpline complaints are normally routed to an employee's human resources director for an investigation, except when the complaint involves that director.  Under those circumstances, the complaint would go elsewhere, normally to the vice president of human resources, to "keep it neutral."  Wright's Integrity Helpline complaint made allegations against three individuals: Parrish, Lombard, and Parker.  Because Parrish was named in the complaint, Davis was assigned to investigate it.  During her investigation into the Helpline complaint, Davis interviewed Wright, along with the three individuals named in the complaint.  She did not interview the other employees in the cath lab, the prior cath lab manager, or anyone else.

---

[10]Although the record reveals that the Integrity Helpline—sometimes also called the Integrity Hotline—is an internal complaint-resolution process, the record does not reveal much about the contours of the program.

### 4. Final Written Warning

On December 27, 2017, Portercare issued to Wright a corrective action form with a disciplinary action designation of "Final Written Warning." The Final Written Warning listed three incidents that were found to "exhibit the unprofessional behavior [of] insubordination, lack of respect, unresponsiveness, ineffective communication and negative attitude": (1) the November 7, 2017 coaching meeting and subsequent "lack of cooperation and follow through" with respect to the data reports[11]; (2) the December 11, 2017 Walmart errand incident[12]; and (3) the December 18, 2017 traveler orientation incident.[13] Wright

_____

[11]As to this incident, the Final Written Warning stated as follows:

During a coaching session . . . , a conversation was had regarding transitioning some of the duties she had been completing during the interim absence of a manager in the Cath Lab department. . . . There were numerous attempts made by the Cath Lab manager to set up time to review these transition items which were unsuccessful due to [Wright's] lack of cooperation and follow through. On 12/13 Director and Manager were on the monthly South Denver Group EP quality meeting when it was noted that none of [the] data had [] been reported since October. Additionally, "bleeding risk scores" had not been reported to South Denver since July 2017. On 12/18 [Wright] spent approx. 5 minutes with manager regarding the EP data.

[12]As to this incident, the Final Written Warning stated as follows:

[Wright], charge nurse, was asked by her manager at 8:22 a.m. to go help the PACU department because they needed help with IV's and vitals. Instead of going to help the PACU, she passed the message to the other members of the Cath Lab team. At 8:31, [Wright] texted her manager back and stated "I'm running over to Walmart. Be right

(continued...)

-13-

[12](...continued)
back." [Wright] clocked out and left campus to go to the store. At 8:45 the manager spoke with the charge nurse of PACU who shared that no one from the Cath Lab team had come over to help.

The first problem is she was the only RN in the Cath Lab and the PACU needed help getting IV's started. However, due to a lack of IV skills, the techs that eventually did respond to PACU were unable to assist with the requested patient care needs. [Wright] willfully disregarded her manager's request and was not there for the team. The second problem is she did not ask leaders for permission to leave campus. The manager texted her at 8:44 and again at 8:53, with no response, to come see her upon [Wright's] return. Upon [Wright's] return to campus, she did not go directly to her manager or director's office first as was requested. She clocked in at 9:03 and arrived to the director's office approx. 9:30 a.m., almost a half an hour after her return from an unauthorized "errand." She did not report to the PACU during this time to assist other associates as requested.

[13]As to this incident, the Final Written Warning stated as follows:

One expectation of [Wright's] role as the charge nurse is to provide orientation to new staff in the department. Two new travelers, a RN and Tech, arrived to the department to orient on 12/18/17. On Friday, 12/15/17, the manager placed on the whiteboard that traveler staff would be arriving to the department on the afternoon of 12/18/17. The morning of 12/18, manager arrived in the control room and spoke with the staff present (two techs) and reminded them that the traveler staff would be arriving that afternoon. . . . Manager had asked [Wright] at approx. 10:30 am, while she was in manager's office, to help orient the new staff who would be in the department at approximately 1:30 pm that day. She verbally agreed.

At approx. 1:00–1:30 the new staff arrived, [but Wright] was not in the control room or the procedure room. The manager had the techs that were present in the Cath Lab orient the staff. As of 3:00 pm, [Wright] had not returned to the lab to help orient the new staff. [Wright] did not fulfill her role as charge nurse and perform the

(continued...)

-14-

met with Parrish on January 5, 2018 to discuss the Final Written Warning. As to the root cause of her clashes with Lombard, Wright indicated the two were having "personality conflict[s]."

Wright initiated an alternative dispute resolution ("ADR") process in an attempt to set aside the Final Written Warning. Like the Integrity Helpline process, the ADR complaint was assigned to Davis. Wright met with Davis on January 8, 2018, to address both the Integrity Helpline and ADR complaints. During this meeting, Davis and Wright engaged in a wide-ranging discussion of the incidents set out as the basis for the Final Written Warning. As was true of her January 5th meeting with Parrish, Wright asserted her issues at work were "part" of a "misunderstanding" and "a personality conflict." Wright also indicated, however, that she did not understand the decision to punish her for the errand incident when male cath lab staffers engaged in the same practices.

---

[13](...continued)
orientation required for the new travelers. Additionally, she did not communicate her whereabouts during this time . . . .

-15-

### 5. Termination

On January 8, 2018, Frank Archuleta became the manager of the cath lab.[14] There is no evidence Archuleta was aware of Wright's "staff issues" when he became the cath lab's manager. Soon after he became manager, Archuleta met with Wright one-on-one. Wright stated she continued to be interested in transferring to Parker Adventist. After this meeting, Archuleta had a positive impression of Wright. His impression of Wright, however, quickly became negative over the next few days. On January 16th, Archuleta met with Parrish "to discuss his concerns and ask for guidance regarding his experience and interactions with" Wright. Parrish took notes of the matters discussed at the meeting.

Archuleta noted it was unlikely Wright was "going to help this department succeed." Wright was sharing her human resources "issues" with cath lab staff and physicians, causing "a lot of emotion" amongst the staff, and her dominant purpose appeared to be to convince him to help her in her quest to transfer to Parker Adventist. Archuleta cataloged an almost daily series of problematic

---

[14]The evidence in the record reveals Lombard was replaced by Archuleta because the cath lab was performing poorly and because the relevant physicians wanted a manager with cath lab experience. At approximately the same time Lombard was replaced by Archuleta, Parker discontinued her responsibilities as director of the cath lab. Thus, upon his hiring as manager of the cath lab, Archuleta answered directly to Pontius. As was true of Lombard, Parker had no prior cath lab experience when she was hired as the cath lab's director.

events in the cath lab, including: (1) Wright stating to Archuleta, in front of cath lab staff, that she had discussed Archuleta with several cardiologists; (2) a pharmaceutical mischarging incident involving Przymus, during which Archuleta believed Wright, West, and Przymus lied to him about the cath lab's drug-charging practices; (3) Wright's resistance to documenting "(LDA's)—documentation for line, drains, assessment"; (4) Wright introducing Archuleta to doctors and/or showing Archuleta texts from doctors indicating Archuleta needed to protect Wright and keep Wright on his team; (5) Wright telling Archuleta her lawyers advised her to not have any interactions with Lombard or Parker; and (6) Wright texting to Archuleta and West a picture of the patient schedule for the following day, with private patient information included, on a day she was out of the hospital sick. At the conclusion of the meeting, Archuleta stated to Parrish as follows: "[Wright] is smart and I wanted her to develop, sad thing is I don't think she wants to be here. I like her as a person. She is very experienced and knows what she is doing. I'm just worried that she is not on board and will damage all of the work I am doing."

With minimal additional investigation, Parrish accepted Archuleta's report as accurate. Parrish felt that her experience with Wright corroborated Archuleta's concerns and made him the more credible witness, rendering it useless to discuss the report with Wright. Thus, Parrish raised Archuleta's concerns with Davis and

Folkenberg, and the three of them decided that termination was the appropriate next step. Parrish avers that the basis for the decision to terminate Wright was that a second manager in a row expressed the perception Wright was unsupportive.

## B.  Procedural Background

The district court granted Portercare summary judgment. It noted Wright had not produced direct evidence of discrimination or retaliation and, thus, employed *McDonnell Douglas*'s burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It assumed Wright had established a prima facie case of both discrimination and retaliation and ruled Portercare satisfied its burden of advancing legitimate, nondiscriminatory reasons for the employment decisions. It ruled that Wright's final written warning listed three nondiscriminatory reasons in support of the denial of Wright's transfer request and ultimate termination. It further concluded Portercare advanced an additional nondiscriminatory basis for Wright's termination: a second manager, in quick succession, informed leadership Wright was not supportive.

Having resolved the first two steps of the *McDonnell Douglas* analysis, the district court proceeded to analyze whether Wright adduced sufficient evidence of pretext to send the case to a jury. It recognized Wright offered overlapping theories of pretext as to her discrimination and retaliation claims. At base, those

-18-

theories relied on (1) assertions of meaningful differential treatment of Wright and the cath lab's male employees and (2) challenges to the veracity of Portercare's stated reasons for its employment decisions, based on alleged irregularities in Portercare's procedures and inconsistencies in its explanations.[15] As to Wright's claim that sex-based differential treatment supported a finding of pretext, the district court concluded the alleged differences in treatment were "trivial or accidental or explained by a nondiscriminatory motive" and thus could not sustain a claim of pretext. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). Next, the district court concluded Wright failed to adduce sufficient evidence from which a jury could conclude Portercare's employment decisions were procedurally irregular. Finally, the

---

[15]The district court summarized these theories as follows:

For her discrimination claim, Wright asserts three overarching theories of pretext: (1) Wright was disciplined for issues for which similarly situated men were not disciplined; (2) there were procedural irregularities in the discipline and termination of Wright; and (3) there were inconsistent explanations for the termination decision.

For her retaliation claim, Wright asserts four overarching theories of pretext: (1) that Wright was denied a transfer, disciplined, and fired shortly after complaining of disparate treatment; (2) the reason for denying the transfer was false and did not comply with Centura's written policies concerning transfers; (3) similarly situated employees were not disciplined for identical infractions and the discipline was procedurally irregular; and (4) the proffered reason for the termination was pretextual for the reasons set forth above.

district court ruled that Wright failed to produce evidence which could call into question Portercare's good-faith belief in the validity of the instances of misconduct set out in the final written warning. *See Bird v. W. Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016) (explaining that, in assessing an employer's legitimate, nondiscriminatory reason for its employment decisions, this court "examine[s] the facts as they appear *to the person making the decision*" and holding that this court does "not ask whether the employer's proffered reasons were wise, fair or correct; we ask only whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs" (quotation omitted)).[16]

## III.  DISCUSSION

This court reviews "the district court's grant of summary judgment *de novo*" and applies "the same legal standard used by the district court." *Swackhammer*, 493 F.3d at 1167 (quotation omitted).  Summary judgment is

---

[16]Wright asserts the district court impermissibly weighed the evidence rather than appropriately determining whether a jury considering the evidence in the light most favorable to Wright could find pretext.  There is reason to doubt this assertion, as the district court repeatedly framed its conclusions in terms of the lack of evidence rather than the weight of evidence.  Ultimately, however, this court need not resolve whether the district court utilized an erroneous standard in evaluating Wright's claims.  On review of a district court's grant of summary judgment, this court engages in de novo review.  *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1337 (10th Cir. 2022).  Because this court can and will apply the correct standard on appeal, there is no need to remand the matter to the district court for further proceedings.  *Id.* at 1340; *Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1227 n.9 (10th Cir. 2014).

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In analyzing the propriety of a grant of summary judgment, this court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Swackhammer*, 493 F.3d at 1167 (quotation omitted). On appeal, the parties dispute only the pretext step of the *McDonnell Douglas* analysis. Accordingly, this court need not consider any issues relating to the first two steps of *McDonnell Douglas*.

"[A] plaintiff utilizing the *McDonnell Douglas* framework normally cannot provide direct evidence of discrimination." *Swackhammer*, 493 F.3d at 1167. "[A] pretext argument provides a method of satisfying this burden by allowing the factfinder to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* (quotation omitted). "A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.* (quotation omitted). "One typical method for a plaintiff to prove pretext is by providing direct evidence that the defendant's stated reason for the adverse employment action was false." *Id.* (quotation omitted). "Another common

-21-

method is a differential treatment argument, in which the plaintiff demonstrates that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff." *Id.* at 1167-68 (quotation and alteration omitted). "Evidence of pretext may also take a variety of . . . forms. A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Id.* at 1168 (alterations and quotation omitted). Ultimately, however, the plaintiff must produce sufficient evidence of pretext to allow a jury to infer that the real reason for the employment decision was prohibited discrimination or retaliation. *Id.*

As set out below, we conclude Wright has failed to carry her burden of "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Portercare's legitimate, nondiscriminatory reasons for its employment decisions. *Id.* at 1167 (quotation omitted). Likewise, the differential treatment identified by Wright, along with the alleged procedural irregularities she identifies, are easily and cogently explained by nondiscriminatory reasons. *Id.* at 1168. Finally, her claim that the relevant employment decisions were infected with procedural irregularity is not remotely convincing. Accordingly, the district court did not err in granting summary judgment in Portercare's favor.

-22-

## A. Alleged Differential Treatment

As support for the notion she was treated differently than the male cath lab employees, Wright notes that after she first met with Lombard on October 15, 2017, Lombard began keeping a log of notes about her communications with Wright. Lombard did not, according to Wright, keep such a log as to any other cath lab employee. Citing to and quoting from Lombard's deposition, Wright asserts Lombard could not explain why she singled Wright out in this fashion. Importantly, however, the quotation set out in Wright's brief omits, with well-placed ellipses, critical portions of Lombard's deposition testimony, including Lombard's testimony that she kept paper notes as to her interactions or coaching sessions with all cath lab permanent employees. After a recess during the deposition, Lombard clarified that it was only after conflicts arose between her and Wright that she started taking more specific notes and transferred those notes from her notebook to a computer. Wright asserts a factfinder could conclude this "clarification," which was made after a discussion with counsel during a break in the deposition, was not truthful.

Wright's arguments as to the computerized log of interactions do not advance her Title VII claims. Even before the break in the deposition, Lombard made clear that she took notes on her interactions with all cath lab permanent employees, male and female. Wright has not identified any evidence remotely

-23-

calling this testimony into doubt.  Furthermore, the computerized log of interactions created by Lombard is dated "12/14/17," demonstrating it was created in the manner described in Lombard's deposition.  It cannot be reasonably denied that by December 14, 2017, Wright and Lombard had had numerous negative interactions.  Indeed, a mere thirteen days later, Wright was issued a final written warning based on incidents memorialized in the log.  Given the undisputed evidence, no reasonable jury could rely on the existence of the computerized log of interactions to conclude Lombard treated Wright worse than the male cath lab employees because Wright was a female.

As the centerpiece for her assertions of differential treatment, Wright claims she was disciplined for running an errand during work hours, when her male colleagues were not.  Like the district court, we conclude no reasonable jury could find Wright was punished for running an errand during work hours.  Instead, the record demonstrates Wright was punished for her insubordinate response to Lombard's orders.  *See supra* n.12 (setting out, in full, the text of the final written warning relating to this incident).[17]

---

[17]In analyzing whether this alleged instance of differential treatment would support a finding of pretext, we draw all reasonable inferences from the evidence in favor of Wright and assume: (1) Lombard's request to help the PACU on December 11, 2017, was transmitted to both Wright and the male cath lab employees, rather than being sent only to Wright; and (2) the male employees were not issued any punishment for their past instances of errand running during

(continued...)

Viewed from Portercare's perspective, *Bird*, 832 F.3d at 1201, the event unfolded as follows. At 8:22 a.m., Lombard directed Wright to "go over to help" the PACU with admission vitals. Nine minutes later, Wright replied by text that she was "running over to Walmart" and would "[b]e right back." Wright did not indicate that she had checked in with the PACU, ask permission to disregard Lombard's order, or indicate her trip to Walmart was consistent with preexisting cath lab practice. Lombard responded by directing Wright to come see her when she returned to the hospital. Lombard then checked with the PACU charge nurse, who told Lombard no one from the cath lab had come to help. In response to this news, Lombard sent another text to Wright, this one indicating Wright should, upon her return to the hospital, meet with both Lombard and Parker, the cath lab director, in Parker's office. This directive—that Wright should meet with Lombard *and their joint supervisor* upon her return to the hospital—made clear Lombard had issues with how Wright had approached her work-hours trip to Walmart. When she clocked back in upon returning to Castle Rock, however, Wright did not proceed directly to Parker's office. Instead, she spent

---

[17](...continued)
work hours. Because no reasonable juror could conclude Wright's punishment over the errand incident was based on the fact she ran the errand, as opposed to being primarily based on her insubordinate responses to her supervisor's requests, this court need not consider further what is at most a weak material issue as to these two asserted facts.

approximately thirty minutes talking with Watson about a toy Wright purchased for her daughter for Christmas. When she did arrive at the meeting with Parker and Lombard, Wright told Lombard the following: "I was sorry that I notified her at all—that we as a team cover for each other if we need to handle errands throughout the day, and do not normally involve management."

Moreover, this event occurred in the context of Wright's history of disregarding Lombard's communications and resisting her authority. Wright found it difficult to accept Lombard as her supervisor and admitted she was "less than" "very friendly and open" towards Lombard or willing to assist Lombard's transition as she became cath lab manager. Wright testified she "had very few conversations" with Lombard, and West explained there was "a tense vibe in the room" when Wright and Lombard were together. Indeed, Wright noted it was widely known at Castle Rock that she was disappointed with the state of the cath lab under Lombard's management. And, by the time of this incident, Lombard had already convened a group meeting with Wright, Parker, and Parrish to discuss more efficient communication between Wright and Lombard regarding the data reports, due to "issues with [Wright] responding to [Lombard's] texts." Parrish indicated as much in an email responding to Wright's complaint about her interactions with Lombard and Parker on December 11th: "With all of the conversations and work that has/is being done currently in the Cath Lab one of

-26-

the main focuses has been about communication and how keeping [Lombard] and [Parker] in the loop on everything that's going on in the Cath Lab is vital."

Thus, viewing the final written warning as focused on Wright's failure to communicate with, and lack of respect for, Lombard is compelled by the record. While Wright's errand certainly led to the final written warning, no reasonable jury could conclude the final written warning was premised on the errand itself.[18] Instead, as is made clear on the face of the final written warning, Wright's subsequent interactions with, and reactions to, her supervisors are what led to the inclusion of the incident in the final written report.[19]

---

[18]Wright's challenges to the veracity of Portercare's reliance on the errand incident to support issuance of the final written report, its use to deny her transfer request, and its use as justification for her termination all also rely narrowly on her assertion she was punished exclusively for running the errand, as opposed to her interactions with her managers thereafter. The same is true as to her challenges to the procedural regularity of the inclusion of this incident in the final written warning. For those reason set out above, these challenges also fail and will not be considered further.

[19]Wright argues Lombard's dialogue with Gleason as to the propriety of punishing Wright for running errands, *see supra* at 9, supports a finding of pretext. This argument is unavailing. True enough, when Lombard sent Gleason the preliminary corrective action, Gleason wanted to confirm Portercare was not disciplining Wright for conduct if other employees engaged in the same behavior. *Id.* The final written warning, however, demonstrates that the main point of the discipline was focused on Wright's behavior toward Lombard. Gleason's e-mail does show that Portercare was aware of a possible Title VII issue if discipline was imposed on Wright but not her male colleagues based on running errands. Gleason's email does not, however, demonstrate Wright was disciplined because she ran errands.

Wright's comparison of herself to the male cath lab employees is thus unavailing. The record does not indicate that these individuals engaged in similar interactions with their supervisors, either in general or in the context of their errands. Considered against the entire record, and even after drawing all reasonable inferences from the evidence in Wright's favor, there is nothing about the inclusion of the errand incident in the final written report that would support a finding Przymus, West, or Voegle were treated differently from Wright because they were men.

Finally, Wright asserts that an incident underlying Archuleta's complaints to Parrish about Wright's performance demonstrates discriminatory differential treatment of Wright and male cath lab employees. Again, Wright's assertion is not supported by the record. When Archuleta met with Parrish on January 16, 2018, to discuss Wright's future in the cath lab, Archuleta related to Parrish, as one of many concerns he had about Wright's commitment to his team, an incident involving perceived incorrect charging of a prescription drug. Archuleta noticed West charged a patient for an entire bottle of lidocaine, while only using one fourth of the bottle. In response, Archuleta instructed staff to only charge the patient for the amount used. West told Archuleta he was following the pharmacy's directions, but he and Przymus clarified with Archuleta that they would only charge for the portion used going forward, as per Archuleta's

instructions.  In contrast, Wright stated as follows to Archuleta: "It would have been nice if people have told us, so we would be doing it that way.  Well that's not what they've told us, this is how we are supposed to do it.  We've never done it that way."  Archuleta told Parrish that, for three reasons, he did not believe Wright's assertion about the cath lab's previous billing practices: (1) the billing error was quickly caught by a Castle Rock employee in revenue management support; (2) Wright and Pryzmus were well-trained "charge champions" and an examination of their past charts revealed proper charging practices; and (3) improper past billing practices would have been discovered during revenue management audits.

Wright correctly notes that during his deposition, Archuleta testified that as to the lidocaine mischarging incident he believed West, Przymus, and Wright had all three lied to him about past billing practices in the cath lab.  She further asserts, based on this testimony, that the fact she was terminated, but that West and Przymus went unpunished, demonstrates the type of differential treatment based on sex upon which a jury could find pretext.  Wright's argument is unpersuasive for several reasons.  Archuleta specifically testified that he had more than one conversation with West and Przymus to address his concern that they were lying to him about past charging practices.  Furthermore, the record definitively reveals that Castle Rock and Portercare management did not tell

Archuleta about Wright's past issues with Lombard in order to give Wright a fresh start. And Wright testified she did not have any basis to believe Archuleta discriminated against her on the basis of her sex. Finally, and most importantly, the charging incident was only one part of a much larger pattern of incidents Archuleta observed, all of the remainder of which were unique to Wright. *See supra* at 16-17 (cataloging some of the relevant incidents). Those incidents, considered in the aggregate, caused Archuleta to conclude Wright was a particular threat to his ability to effectively manage the cath lab. In that regard, Archuleta noted that Wright was uniquely influential in the cath lab, as demonstrated by the fact that West's and Przymus's resentment towards hospital management and administration seemed to originate with Wright and by the fact that in expressing resistance to change West and Przymus referenced Wright's opinions.

Given the record in this case, no reasonable juror could conclude any differential treatment that might exist as to Wright and the male cath lab staff flowed from sex-based animus. Accordingly, no reasonable juror could use differential treatment as a basis for finding pretext in this case.

**B. Falsity of Reasons for Adverse Employment Actions**

Wright asserts she has demonstrated "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Portercare's proffered legitimate reasons for its employment actions such that a reasonable factfinder

could rationally find them unworthy of credence. *See Swackhammer*, 493 F.3d at 1167. In contrast to this assertion, however, this court concludes Wright has not made the necessary showing.

Wright asserts a reasonable jury could find that Lombard did not specifically instruct her to orient the travelers arriving at the cath lab on December 18, 2017, and could also find that, during Royer's tenure as manager of the cath lab, orienting travelers was not a duty of the cath lab's charge nurse. We agree a jury could so find. Those findings, however, would not be sufficient for a jury to find that Portercare did not, in good faith, issue Wright a final written correction based, in part, on her actions on December 18th. *Bird*, 832 F.3d at 1201 (holding that this court "examine[s] the facts as they appear *to the person making the decision*" and does "not ask whether the employer's proffered reasons were wise, fair or correct; we ask only whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs" (quotation omitted)). On the Friday before the travelers were expected to arrive, Lombard noted on the cath lab's whiteboard that travelers would be arriving in the department on the afternoon of December 18th. Wright acknowledged she had notice of the arrival of travelers from the whiteboard and testified that in the past she had generally oriented traveler nurses and Przymus had oriented the "tech" travelers. Nevertheless, Wright did not participate in the orientation of the traveler nurse

-31-

who arrived on December 18, 2017. Furthermore, as specifically noted in the final written warning, *see supra* n.13, Wright was absent from the cath lab during this time frame and did not communicate with management about her absence. Finally, the inclusion of the travelers incident must not be viewed in isolation but, instead, must be viewed from Portercare's perspective. By the time of the travelers incident, Lombard, Parker, and Parrish had engaged Wright in numerous conversations about Wright's unwillingness to communicate with and respect Lombard. On the record before the court, no reasonable jury could conclude Portercare did not, in good faith, believe in the validity of the sanctionable nature of the travelers incident.

Wright also challenges the veracity of Portercare's reliance on the data-reports incident. Again, however, her argument merely nibbles around the edges of the incident and, ultimately, fails to create jury questions as to Portercare's good-faith reliance on the data-reports incident to justify its employment actions. *See Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005) ("[A]s a general rule, an employee must proffer evidence that shows each of the employer's justifications are pretextual." (quotation omitted)). Wright points to evidence indicating two instances in which she either met with, or tried to meet with, Lombard regarding the transitioning of the data reports from her to Lombard. Even if true, however, that fact does not demonstrate Lombard, Parker,

Parrish, or Portercare's leadership did not believe Wright was resistant to training Lombard as to the management functions of the cath lab. Indeed, the record is rife with evidence that Wright, and the other members of the cath lab, found it unfair Wright was being required to train Lombard. The record also reveals that Lombard included her supervisor and a human resources representative in the meeting on November 7th, which focused on making sure Wright aided Lombard in coming up to speed in preparing the data reports, specifically because Wright had theretofore been unresponsive to Lombard's requests.

In any event, the final written warning makes clear that the data-reports incident merited punishment because Wright failed to finish three months' worth of data reports as specifically directed by her manager. *See supra* n.11. Wright does not address this aspect of the incident in her appellate brief. In her deposition and affidavit, Wright claimed this task was Lombard's responsibility, but she does not point to any evidence indicating Lombard was precluded from delegating the task to her. The emails Lombard sent Wright on November 6th make clear that Lombard did delegate the task to Wright. *See supra* n.5.

## C. Procedural Irregularities

Finally, Wright sets out a scattershot listing of supposed procedural irregularities attendant to the challenged employment actions. None comes close

to creating a material issue of fact as to pretext, and all can be dealt with in summary fashion.

Wright attempts to assign procedural irregularity to the fact Castle Rock CEO Folkenberg, aided by human resources representatives Davis and Parrish, made the decision to terminate her employment. She cites a brief passage of Parrish's deposition wherein Parrish notes human resources does not recommend punishment but, instead, acts as "a consultant and a guide." Wright also insinuates it was odd that her former and current managers, Lombard and Archuleta, did not participate in the termination decision. The problem for Wright, however, is that she does not cite any evidence indicating it was unusual for Folkenberg to make ultimate decisions as to punishing or terminating employees, nor does she cite any evidence that Davis or Parrish acted outside their normal role in guiding Folkenberg in resolving that question. Furthermore, based on the record before this court it cannot be reasonably argued that Archuleta, an individual Wright testified she had no reason to think was biased against women, did not play a process in Wright's termination. Instead, his lengthy and detailed discussion with Parrish about his doubts Wright would help the cath lab succeed was the direct cause of Wright's termination. Given how soon Archuleta expressed new concerns about Wright following the issuance of the final written warning, it is not remotely unusual Folkenberg decided to

terminate Wright's employment.  And she provides no explanation why Lombard, as her former manager, should have been involved in the termination decision.

Wright asserts Davis's participation in the Integrity Helpline and ADR investigations was inappropriate because she was not neutral.  The record definitively demonstrates, however, that Davis acted consistent with Portercare policy.  Indeed, there is no indication in the record that Davis was not expected to resolve Wright's complaint at "Step 4" of the ADR process even if she was involved in earlier discussions about the propriety of denying Wright's transfer request pending issuance of the final written warning.  Nor can Wright identify any aspect of Portercare policy that obligated Davis to interview witnesses whose testimony she did not think would be material to the denial-of-transfer decision. Finally, although there is evidence Davis played a part in the decision to deny Wright's transfer request while a final written warning was in the final stages of issuance, there is no evidence Davis played any part, prior to Wright's invocation of the Integrity Helpline and ADR processes, in deciding whether the events recounted in the final written warning were accurate and/or justified punishment.

Wright asserts that the denial of her request for a transfer was inconsistent with Portercare's policy.  Portercare's policy states that an employee is not eligible to apply for a transfer if the employee has received a corrective action during the last six months.  Although it is certainly true Wright had not yet

-35-

received her final written warning at the time she requested to transfer, it is also true the warning was in the process of finalization. As noted by Portercare, the obvious purpose of this policy is to prevent problematic employees from transferring to other Portercare facilities to escape their situations without first resolving their behaviors. The question here is not whether Portercare's interpretation of its policy was "wise, fair or correct." *Bird*, 832 F.3d at 1201. Instead, the question is whether Portercare operated in good faith when it interpreted its policy as obligating Wright to resolve her issues at Castle Rock before transferring to Parker Adventist. On that point, Wright has not come close to creating a fact issue for the jury. Indeed, she does not point to any evidence indicating the interpretation of internal policy adopted by Portercare in this case is remotely at odds with past applications of the policy.

Finally, Wright asserts it was procedurally irregular that Portercare failed to investigate the accuracy of Archuleta's complaints about her before terminating her employment. The problem for Wright is that the only relevant Portercare policy she cites is one relating to the investigation of acts of disparate treatment. As noted above, however, there is nothing about Archuleta's complaints to Parrish that would support a finding of prohibited disparate treatment. *See supra* at 28-30.

## IV.  CONCLUSION

For those reasons set out above, the order of the United States District Court for the District of Colorado granting summary judgment in favor of Portercare is hereby **AFFIRMED**.